ANDREW, J. T. C.
This is a local property tax proceeding involving land and improvements owned by plaintiff Sunshine Biscuits, Inc., located at the north corner of Bordentown-Amboy Turnpike and Jernees Mill Road and designated as Block 14, Lot 1, on the tax map of the Borough of Sayreville. Plaintiff contends that the subject of this action had an assessment in excess of its fair market value for each of the tax years of 1978,1979 and 1980. Further, plaintiff maintains that there is inequality in assessment and seeks the application of a common level or ratio to the alleged true value.
*489 The assessments, affirmed by the Middlesex County Board of Taxation for each year under appeal, were as follows:
1978-1979 1980
Land $ 785,700 Land $ 864,300
Improvements 19,383,200 Improvements 20,780,300
Total $20,168,900 Total $21,644,600
At the outset the parties stipulated that N.J.S.A. 54:2 — 40.4, commonly referred to as chapter 123, would be inapplicable for the tax years of 1978 and 1980 since defendant conducted a revaluation effective for the former year and a reassessment effective for the latter.[1]
The subject consists of 16 light industrial buildings containing 870,378 square feet, 73% of which is on the first floor, 23% on the second floor and 4% on the third floor, situated on 46.375 acres of land. The improvements, which are various interconnected building sections, were constructed in stages, most of which occurred in 1948 (36%) and 1964 (63%), while some minor additions were built in 1970 and 1976 (1%).
The entire facility is occupied by plaintiff as a bakery of cookie and cracker products. It was acquired by plaintiff in 1963 from Owens Illinois, a previous owner-user who had utilized the property for the manufacture of glass products.
I
On the issue of true value plaintiff presented a number of experts, the first of which had an extensive background in the valuation of large industrial plants. This witness, a member of the American Institute of Real Estate Appraisers and the Socie *490 ty of Real Estate Appraisers, provided an appraisal report more comprehensive both in data and analysis than is usually seen in local property tax cases. He derived his value estimates by means of the three traditional approaches to the valuation of real property. His estimates for each of the assessment dates were as follows:
October 1, October 1, October 1,
1977 1978 1979
1. Cost approach 8,800,000 9.600.000 9.400.000
2. Market data approach 7,000,000 7.400.000 7.400.000
3. Income approach 5,800,000 6,000,000 5.700.000
He correlated these value estimates and ascribed final values for the subject of $7,000,000 for 1978, $7,400,000 for 1979 and $7,400,000 for 1980. As is readily apparent, plaintiffs expert relied primarily upon the market data or direct sales comparison approach in his reconciliation of value estimates.
Plaintiff’s expert utilized seven sales of unimproved land to establish a land value for the subject of $810,000 for 1978, $835,000 for 1979 and $880,000 for 1980. Since defendant presented no proofs with regard to land value and as plaintiff’s cogent estimates clearly overcame the presumption of correctness attached to the judgment of the Middlesex County Board of Taxation, I will adopt such values and conclude that land values are as stated above for the tax years indicated.
While plaintiff’s appraiser utilized all three approaches to value, he stated that he relied most heavily upon the market data approach. It was his opinion that the cost approach could not readily be used with buildings that had a physical age of greater than five years because of the difficulty in the measurement of all forms of depreciation. He did, however, present a thorough cost approach value estimate utilizing for the most part the Marshall Valuation Service, a nationally known building cost manual published by the Marshall and Swift Publication Company. In his determination of physical deterioration and *491 obsolescence, both functional and economic, he relied upon depreciation tables and building life expectancy charts published by Marshall and Swift, along with his observation of the property and an analysis based upon his experience and judgment. Although his report demonstrated comprehensive analysis of the factors entering into his final estimates of depreciation, he indicated that he gave the least amount of weight to the cost approach because of the age of the subject and the inherent difficulty in the admeasurement of depreciation. He further indicated that buyers and sellers of old industrial plants do not generally consider the cost approach when negotiating a sale price.
Plaintiff’s expert was of the opinion that the market data approach to value should be given preponderant influence because it reflects the actions of buyers and sellers in the marketplace. In his direct sales comparison he relied upon the sales of eight large industrial plants located generally between northern New Jersey and the metropolitan Philadelphia, Pennsylvania, area. He felt that only sales of plants containing close to 500,000 square feet of building area could be used for comparative purposes because the market for facilities the size of the subject is very limited. After a complete analysis of the eight industrial plant sales, which included adjustments, among others, for location, time, building size and characteristics, age and condition of improvements, functional utility, real estate taxes, conditions of sale and zoning, he concluded a value of $8.00 a square foot, land and building merged, for 1978, and $8.50 a square foot for 1979 and 1980. This produced rounded values of $7,000,000 for 1978 and $7,400,000 for 1979 and 1980. It is noteworthy that plaintiff’s expert also submitted data and an analysis of the sales of nine plants located in Middlesex County and Somerset County ranging in size from 220,000 to 472,000 square feet. These sales were used as a check by plaintiff’s expert and were offered as corroborative support for his estimate of value.
In support of the hypothesis of plaintiff’s expert that the market data approach is the most probative in the elusive quest *492 for true value, plaintiff submitted the testimony of an industrial real estate developer and an industrial real estate broker. The developer felt that the subject was not a unique or special purpose building but rather a general purpose industrial building which he categorized as a warehouse and distribution center. He concluded that the demand in the area of the subject property for industrial space during the relevant assessment periods was for warehousing space.
The industrial real estate broker indicated that there was a limited market for a building the size of the subject and concurred with the developer that demand in the area of the subject is for warehousing space. The industrial broker indicated that in his experience prospective buyers of industrial facilities examine the market in terms of availability of other facilities; therefore the market data approach would be the guiding factor. It was his opinion that purchasers do not look at prospective buildings by means of the cost approach. The broker concluded with his opinion that the relevant market for a user-potential purchaser of an industrial building of the size of 500,000 square feet or greater, would be from Albany, New York, south to Baltimore, Maryland. He testified that the area of northern New Jersey to Philadelphia, Pennsylvania, would be a minimum area in which a prospective purchaser would seek a property the size of the subject.
Plaintiffs appraisal expert also utilized an economic analysis or income approach to value. He relied upon five rentals of industrial plants located between Harrison, New Jersey, and Philadelphia, Pennsylvania. The five rentals were for space ranging from 108,686 square feet to 666,000 square feet. He thoroughly analyzed each comparable transaction and after extensive adjustments for many enumerated factors and based on the assumption that one tenant would lease the entire property and be responsible for all expenses, concluded that economic net rental for the subject would be $1.10 a square foot for 1978, $1.20 a square foot for 1979 and $1.25 a square foot for 1980. These estimates produced a yearly rounded economic rental of $957,000 for 1978, $1,044,500 for 1979 and $1,088,000 for 1980. *493 From these economic net rentals he deducted a vacancy and collection loss factor of 10% of the rental value to derive an effective net income from which he deducted an allowance of 3% for management services to arrive at net operating income. This net income was then capitalized into value by a building residual technique utilizing interest rates, developed through a band of investment methodology, of 11% for 1978,12% for 1979 and 13.5% for 1980, and a recapture rate of 5% derived from an analysis of the remaining economic life of the improvements. The real estate developer and real estate broker presented by plaintiff agreed that the rates of return postulated by plaintiff’s appraiser were reasonable for the tax years in question based on their knowledge of the market for industrial facilities.
Although, as previously stated, plaintiff’s appraiser detailed each approach to value with a plethora of supporting data, he placed primary reliance on the market data approach because it is most reflective of the interaction of buyers and sellers in the industrial real estate market. He used the income approach as a check or secondary approach because the subject property is owner-occupied and it would be difficult to find a single tenant for the entire property. If a single tenant could not be found, the owner would be required to convert the improvements to a multiple-tenant operation at an undetermined cost.
Defendant presented an appraiser who, also, had an extensive background in the valuation of large industrial facilities. Defendant’s expert, a member of the American Society of Appraisers, was of the opinion that the cost approach was the only appropriate method to utilize in the estimation of the value of the subject property. This was his opinion in spite of his concession that the subject is a general purpose industrial facility and could be used by another industrial user. He expressed the thought that since the subject was user-type and not investor-type real estate, the income approach would be inappropriate. He further felt that the market data approach was irrelevant because of the adjustments which would be required in a sales comparison.
*494 Relying solely upon the cost approach, he estimated the depreciated value of the improvements to be $14,912,549. Utilizing the Marshall Valuation Service, he estimated the reproduction cost of each building and then deducted his estimate of physical deterioration and functional obsolescence. He did not value the land since it was not part of his financial arrangement with defendant.[2] Cross-examination revealed a number of discrepancies in the expert’s appraisal. He valued the improvements for only the year 1978, and his valuation date for that tax year was January 1, 1978 rather than the assessment date of October 1, 1977, as prescribed by N.J.S.A. 54:4-23. He indicated that his value estimate could not be used for 1979 or 1980. There is, thus, an absence of any proof by defendant as to true value for either 1979 or 1980.
Moreover, there were numerous mathematical errors in calculations by defendant’s appraiser. There were mistakes in the description of some of the improvements. There were a number of errors in adjustments as to ceiling heights, heating and cooling facilities, sprinklers and ages of certain portions of the improvements, along with unexplained adjustments and unsatisfactory explanations for a number of adjustments. Additionally, defendant’s expert did not provide any explanation for his depreciation allowances other than to express the percentages.
N.J.S.A. 54:4-23 provides the statutory criterion for the determination of value in a local property tax case. The statute directs the value to be that price which a parcel of real property would sell for on October 1 of the pretax year. In New Jersey the concept has been more particularly expressed in terms of the price which could be obtained for the property, in money, at a fair sale between a willing seller and a willing buyer. New Brunswick v. Division of Tax Appeals, 39 N.J. 537, 543, 189 A.2d 702 (1963). Fair market value is expressed in terms of the value which property has in exchange for money. Hackensack Water Co. v. Division of Tax Appeals, 2 N.J. 157, 163, 65 A.2d 828 (1949).
*495 Defendant asserts that the only method by which one can arrive at fair market value for the subject property is by means of a cost approach analysis, while plaintiff maintains that the market data approach provides the surest guide to value. The answer to which approach to value should predominate depends upon the facts of the particular matter. New Brunswick v. Division of Tax Appeals, supra. This court has previously indicated that the cost approach is normally relied upon to value special purpose or unique structures for which there is no market.[3] Dworman v. Tinton Falls, 1 N.J.Tax 445, 452 (Tax Ct. 1980), aff’d o.b. 180 N.J.Super. 366, 3 N.J.Tax 1, 434 A.2d 1134 (App.Div.1981), certif. den. 88 N.J. 495, 443 A.2d 709 (1981).
Property was categorized as special purpose in nature and uniquely adapted to its business purpose in Anaconda Co. v. Perth Amboy, 157 N.J.Super. 42, 45-46, 384 A.2d 531 (App.Div. 1978). The complex in that case was an electrolytic copper refinery, and the Appellate Division held that the only proper approach to value was the cost approach. See also, RCA Corp. v. East Windsor Tp., 1 N.J.Tax 481 (Tax Ct. 1980).
However, property does not qualify as a specialty where it possesses certain features which, while rendering the property suitable to the owner’s use, are not truly unique. Dworman v. Tinton Falls, supra 1 N.J.Tax at 455. Property should not be valued as a specialty merely because it contains certain features adapted to plaintiff’s use. In this case the testimony by plaintiff’s experts and also by defendant’s appraiser was to the effect that the subject property could be used for other light manufacturing or as a warehouse and distribution center. There was no evidence to indicate that the property was so uniquely suited to plaintiff’s business as not to be reasonably adaptable to other industrial uses.
*496 Defendant further contends that the market data approach as applied by plaintiff’s appraiser is fundamentally flawed because it is based on sales of industrial plants outside of Sayreville and outside of Middlesex County. While it is generally true that sales of comparable facilities should not be too remote in location from the subject property, the process of comparison must be based on sales that reflect typical market action within the market in which the property would be sold. American Institute for Real Estate Appraisers, The Appraisal of Real Estate (7 ed. 1978), 274r-275. The market for a particular parcel of real estate consists of the potential purchasers, unlimited by a specific geographical location. Ibid. The effectiveness of comparable sales which are some distance from the subject depends, in large part, upon the nature and character of the property involved.[4] The record clearly reveals, in this matter, that the market for the subject would be, at a minimum, from northern New Jersey to metropolitan Philadelphia, Pennsylvania. Defendant’s appraiser conceded that the market would probably encompass an even greater geographical area. The evidence is sufficient to support a finding, and I so find, that there is a broad regional market for industrial plants such as the subject. The ultimate purpose of valuation is to arrive at a fair and realistic value of the property involved. This requires a view of the action and reaction of the potential buyers and sellers. If the potential buyers would not be limited to a narrowly confined area, I see no reason why this court should put on blinders and ignore economic realty.
The line of cases which defendant has advanced in support of its proposition that the cost approach is the only acceptable procedure involve improvements which are either particularly unique in character, incapable of economic conversion to other *497 uses, or for which there was inadequate data relating to market transactions of similar properties. The courts, therefore, resorted to the cost approach in the absence of any other meaningful procedure. Kearny v. Division of Tax Appeals, 137 N.J.L. 634, 61 A.2d 208 (1948); Harborside Warehouse Co., Inc. v. Jersey City, 128 N.J.L. 263, 25 A.2d 291 (1942), affd 129 N.J.L. 62, 28 A. 2d 91 (E. & A. 1942). In this proceeding the subject is not a structure designed for unique purposes nor is there a paucity of market data or comparable sales within the relevant market.[5]
The reproduction cost method of valuation produces a significant indication of value when the improvements are new and physical, functional' and economic depreciation are measurable. The Appraisal of Real Estate, supra at 507. This methodology, however, may result in serious error when depreciation is not objectively measurable. Therefore, most courts have utilized this method as the only approach in those limited instances in which no other method of valuation will yield a economically realistic value. 1 Bonbright, Valuation of Property, 175-176. This pragmatic approach is reflected in modern appraisal practice which has also relegated the cost approach to a secondary role because cost may not effectively reflect market conditions. O’Flaherty, “Cost Approach To Value,” in Friedman, Encyclopedia of Real Estate Appraising (3 ed. 1978), 66-67.
In addition to sound appraisal theory, there are additional reasons why the market data approach is the most realistic in this case. Normally the approach to value which is best supported by factual data is the primary approach, leaving the other methods to play a secondary or checking role. Here, plaintiff’s expert presented his analysis of an impressive and extensive array of sound data in support of his market data *498 approach. The data logically and cogently supported his conclusions. The comparables, although not identical, represented reasonable alternatives for prospective industrial buyers who would be interested in the subject property.
Contrasted to this was the value estimation of defendant’s expert, replete with errors and unsupported and unexplained adjustments and allowances. This displays the danger in relying on only one approach to value. If the values derived from two or more approaches to value vary greatly, there is an indication that some data used in one or more approaches may have been improperly weighed or that there may have been a failure to include important information. Utilization of only one approach to value will not provide this caveat. Plaintiff’s expert’s use of all approaches to value along with his reconciliation of values demonstrates the validity of his value estimation.
Therefore, I see no reason why this court should not adopt the value conclusions of plaintiff’s expert derived from all three approaches to value, but with emphasis placed on the market data approach as the primary procedure.
In view of the foregoing, I find the true value of the subject property to be as estimated by plaintiff’s expert, namely, $7,000,000 for 1978 and $7,400,000 for 1979 and 1980, allocated as follows:
1978 1979 1980
Land $ 810,000 Land $ 835,000 Land $ 880,000
Improvements 6,190,000 Improvements 6,565,000 Improvements 6,520,000
Total $7,000,000 Total $7,400,000 Total $7,400,000
n
I turn, now, to a consideration of the discrimination aspect of this proceeding. When a taxpayer’s real property is assessed at a ratio to true value substantially higher than the common level of assessments in a taxing district, then the taxpayer is ordinarily entitled to a reduction of his assessment to the valuation resulting from an application of the common
*499 level to the true value of the taxpayer’s property. In re Appeal of Kents, 2124 Atlantic Ave., Inc., 34 N.J. 21, 166 A.2d 763 (1961).
Common level has been defined by our Supreme Court as “a ratio to or percentage of full true value at which property generally [is] assessed in the municipality,” or, alternatively, as that ratio or percentage of true value “about which the bulk of individual assessments [tend] to cluster....” Id. at 26-27; Siegal v. Newark, 38 N.J. 57, 63, 183 A.2d 21 (1962).
Plaintiff urges that there was a common level of assessment in the borough for the tax years in question. This common level was at a percentage equal to the unweighted, unclassified sale-assessment ratio determined as of October 1, of each tax year. Hence, these unweighted, unclassified ratios should be applied to the determined true value each year in order to obtain appropriate assessments.
In support of its assertion that the common level of assessment was reflected in the unweighted, unclassified ratios for each tax year, plaintiff offered the testimony of an appraisal expert who provided a ratio analysis of the statistical data utilized by the Director of the Division of Taxation, and a statistician who presented a statistical analysis of the same data.
The study consisted of 93 usable sales for 1978, 288 usable sales for 1979 and 76 usable sales for 1980. The record reveals there were 8,927 assessable properties or line items in the borough in 1978, and 9,002 line items in 1979. There was no evidence as to the number of assessable line items in 1980 but it can be safely assumed by the numbers in the prior years that there were approximately 9,000. Plaintiff’s statistician observed that 30 sales would constitute a sample of sufficient size to produce reasonable statistical results. This would be true whether the total number of line items was 900 or nine million. The difference would be in the degree of statistical error that could result but not in the adequacy of the sales sample base. Plaintiff’s appraisal expert derived the following unweighted, unclassified ratios from the sales data:
*500 1978 — 93.79%
1979 — 82.79%
1980 — 75.13%
The general coefficients of deviation which measure the deviation from the unweighted, unclassified ratio within a taxing district, were:
1978 — 10.21
1979 — 13.40
1980 — 13.50
Utilizing these data, plaintiff’s appraisal expert concluded that a common level, as that term was previously defined, did exist in the borough and that it was reflected in the unweighted, unclassified ratios for each year. Plaintiff’s statistical expert corroborated this conclusion and further indicated that the unweighted, unclassified ratio is the only reliable basis for determining a common level from a sample of sales within a municipality. Both experts were of the opinion that the Director’s ratio (used in chapter 123), which is a weighted, classified ratio, is subject to distortion by one weighted extreme value; hence, the unweighted, unclassified ratios were better indicators of a common level of assessment.[6]
Plaintiff’s statistician presented an analysis which was an attempt to predict from the sales that did occur what the assessment-sale ratio of each property in the borough would be if all of the properties were sold within a given period. By means of a standard deviation technique and using statistical inference and the laws of probability, he constructed confidence intervals for the sales samples. He indicated that he could determine with a 99% degree of confidence (level of confidence) that for 1978, if all of the properties in the borough were sold, each would sell at an assessment-sale ratio of between 90.24% to 97.34% (confidence interval). He did the calculations for each tax year and concluded confidence levels as follows:
*501 99% Confidence Interval
1978 90.24% to 97.34%
1979 79.91% to 85.67%
1980 70.78% to 79.48%
In using a 99% confidence interval it was shown that there was a .5% chance that a particular property would sell at an assessment-sale ratio in excess of the indicated confidence interval range, and a .5% chance that it would be below such confidence interval. It was his opinion that it was statistically impossible to specify at what point within the confidence interval a specific assessment-sale ratio would fall, but that selecting a mean ratio (here, the unweighted, unclassified ratio) was the best approach.
Relying upon a line of cases decided prior to In re Kents, supra, defendant, in its brief, maintains that taxpayer has not established bad faith or an intent to discriminate on the part of the taxing authority and therefore is not entitled to discrimination relief.
Defendant seeks to distinguish Kents and its progeny on the basis that Kents involved a situation where the taxing authority did not conduct periodic general revaluations. Here, the borough conducted a district-wide revaluation effective for 1978 and a district-wide reassessment effective for 1980. Therefore, the argument proceeds, Kents type relief is available only when there has not been a recent revaluation or reassessment unless the taxpayer can prove discriminatory intent. Defendant’s contention is not persuasive.
In Kents Chief Justice Weintraub indicated that if there were, in fact, a common level, it would be a simple matter to eliminate a disparity by the reduction of an assessment to that level. Id. 34 N.J. at 26, 166 A.2d 763. The difficulty that inheres in these kinds of cases is with regard to the proof of a common level. In Kents the sales data revealed that there was no common level of assessment. However, the court did not hesitate to point out that
*502 If the sales data used to find the ratio in fact revealed some percentage of true value about which the bulk of individual assessments tended to cluster, one might accept that percentage as the common level of assessments. [Id. at 27, 166 A.2d 763]
The court further stressed the principle that
... relief-fro'm unequal treatment will be granted ... upon an appropriate basis requiring the individual taxpayer to prove no more than sensibly can be expected of him. [Id. at 31,166 A.2d 763]
Relief was envisioned in Kents whether the wrong was the result of bad faith or simply the “aftermath of a failure to comply with the law.” Id. at 29, 166 A.2d 763.
Following Kents, the Appellate Division in Continental Paper Co. v. Ridgeville Park, 122 N.J.Super. 446, 300 A.2d 850 (App. Div.1973), held that in order to establish a case of actionable discrimination the following elements must be proved:
... (1) that the real property generally in the municipality was assessed at less than true value; (2) what the common assessment level was and (3) the true value of the subject property upon which the common level percentage would operate. [Id. at 450,300 A.2d 850]
Conspicuously absent from these elements is any necessity to demonstrate intent to discriminate on the part of the taxing authority.
Justice Schreiber, writing for the court in Piscataway Associates, Inc. v. Piscataway, 73 N.J. 546, 376 A.2d 527 (1977), had this to say about the question of discriminatory intent:
The Appellate Division has drastically restricted the general proposition enunciated in Kents to those situations where there is found a condition of complete planlessness in local assessments. If that reasoning were followed, a taxpayer would be denied relief even though its property was assessed at 100% of true value while the properties of others were being assessed at 33% of true value, provided that a general revaluation had been made within a decade. In addition the dissenting opinion would limit Kents type relief to those cases where the assessor has not in good faith attempted to achieve a common level. A fair reading of Kents does not support that interpretation. Rationally it would be absurd to deny relief because an assessor’s intent was bona fide albeit the result was a level which was wholly disproportionate. A taxpayer who is shouldering substantially more than his fair share of taxes would rarely, if ever, obtain relief.... When the taxpayer has shown that there is being imposed upon him an undue burden because it is so disparate when compared with others generally, as here, he is entitled to relief, [id. at 556, 376 A.2d 527; emphasis supplied]
Aside from the defense of an absence of discriminatory intent, defendant’s proofs, at trial, attempted to show that the data, *503 analyses and conclusions derived from the assessment-sale ratio studies were insufficient to support a determination that a common level of assessment existed within the borough for each of the tax years. Initially, defendant advanced the thought that the class 2 sales (one- to four-family residences) greatly outnumber the class 4 sales (commercial, industrial and five-family or more residential), and any overall ratios derived from these sales would reflect the level of assessment for class 2 and not class 4, as is the subject of this matter. The case of Siegal v. Newark, supra, disposes of this contention.
In Siegal taxpayers claimed that class 2 property was assessed at a common level of 40% while class 4 property was assessed at a common level of 70%. They sought an application of the class 2 ratio to their class 4 property because most of the sales occurred within class 2. The court held that they were not entitled to have the assessment of their class 4 property reduced to 40% but rather to the common level for all property. Any other result would have been impermissible classification violative of the New Jersey Constitution. Switz v. Kingsley, 37 N.J. 566, 182 A.2d 841 (1962).
Defendant also urges the invalidity of plaintiff’s sales-ratio data on the basis that such studies are designed to accomplish only two objectives. The first is to fix a basis for the distribution to municipalities of state aid for education, N.J.S.A. 54:1-35.1, and the second is to fix the basis for the allocation among municipalities of the burden of taxation for the support of county government. N.J.S.A. 54:3-17. The fact that the Legislature adopted the assessment-sale ratio studies for these stated purposes does not thereby, in itself, invalidate the results produced by these studies for other purposes. On the contrary, the Local Property and Public Utility Branch of the New Jersey Division of Taxation advocates the use of the assessment-sale ratio data in determining the need for a municipal revaluation. Handbook for New Jersey Assessors (June 1980 rev.), §§ 801.3, 803.31. The Handbook indicates that data from the ratio studies can demonstrate that there is substantial uniformity in assessment and that equality does exist in a taxing district, or conversely, *504 that substantial equality in assessment does not exist. Ibid. Our courts have recognized the efficacy of sales ratio data in individual local property tax proceedings. Piscataway Associates, Inc. v. Piscataway, supra. Moreover, defendant’s argument wholly ignores the legislative use of the assessment-sale ratio studies in chapter 123 where the statutory purpose is to eliminate discrimination in assessment in local property tax cases. N.J.S.A. 54:2-40.4.
Of greater moment in this matter, although not raised by defendant, is the question of whether discrimination relief may be granted when chapter 123 provides no remedy. N.J.S.A. 54:2 — 40.4; N.J.S.A. 54:3-22(c) to (f). The parties stipulated at the outset of the hearing that chapter 123 did not apply for the tax years 1978 and 1980 because by its terms chapter 123 excludes from its operation any tax year in which a revaluation or a reassessment has been implemented. For the tax year 1979 the chapter 123 ratio was 102%. Pursuant to the statute taxpayer is entitled only to a reduction to true value. See N.J.S.A. 54:2-40.4(c).
As previously indicated, taxpayer seeks an application of the unweighted, unclassified ratios alleged to be the common level of assessment, for each tax year. Can such relief be granted in light of the nonapplicability of chapter 123 for any of the years in question?
This court has had a number of occasions to consider the issue of whether chapter 123 is the exclusive remedy in a discrimination case. Writing for the Tax Court, Judge Evers traced the history of chapter 123 and concluded that it was not the exclusive remedy for assessment inequality but rather merely established a rebuttable presumption of a common level as the basis for relief. This presumption, however, the court emphasized, can be rebutted by a party in any fashion demonstrating that a common level of assessment exists in the taxing district different than the ratio prescribed by chapter 123. Devonshire Develop. Assoc, v. Hackensack, 2 N.J.Tax 392, 184 N.J.Super. 371, 446 A.2d 201 (Tax Ct. 1981); Diament v. Fort Lee, 3 N.J.Tax 70 *505 (Tax Ct. 1981); 525 Realty Holding Co. v. Hasbrouck Heights, 3 N.J.Tax 206 (Tax Ct. 1981).
In 525 Realty plaintiff sought the application of the unweighted, unclassified ratio rather than the chapter 123 ratio for the tax year of 1978. Plaintiff asserted that the unweighted, unclassified ratio represented the common level of assessment. The court, however, held that the presumption of common level established by chapter 123 had not been overcome because of an insufficiency of proof. It is to be noted that the court was not faced with the question of whether discrimination relief should be granted but rather with the measure of it.
In another case, somewhat along the lines of 525 Realty, plaintiff, also, sought the application of unweighted, unclassified ratios as opposed to the ratios prescribed by chapter 123. In Rudd v. Cranford, 4 N.J.Tax 236 (Tax Ct. 1982), Judge Crabtree held that the quantitative difference in the two ratios was without constitutional significance; hence the chapter 123 ratios should be applied because their presumptive validity had not been overcome. Here, again, was a case that did not involve whether relief should be granted, but rather the measure of it.
In Murnick v. Asbury Park, 2 N.J.Tax 168 (Tax Ct. 1981), the court was confronted with the question of whether the appropriate ratio to be used was the chapter 123 ratio or the Director’s ratio for the particular tax year. Here, unlike 525 Realty and Rudd, the issue was whether discrimination relief should be granted because the taxpayer’s assessment-value ratio for the tax year fell within the common level range provided by chapter 123, therefore precluding relief unless the Director’s ratio was applied. Interestingly enough, in Murnick the chapter 123 ratio for that year was the unweighted, unclassified ratio and plaintiff sought application of the Director’s ratio which is now the central figure in the chapter 123 formula.[7] The court found *506 that there was a complete absence of any common level within the taxing district and held that the Director’s ratio should be applied to provide a measure of relief not permitted by chapter 123.
In this case, unlike Murniek, plaintiff contends there is a common level of assessment and that it is entitled to an assessment at that common level as reflected by the unweighted, unclassified ratios.
For the tax year of 1978 the unweighted, unclassified ratio was 93.79%. The proofs submitted by plaintiff were impressive but I conclude that they were insufficient to overcome the presumptive validity of the 1978 revaluation at 100% of true value. Piscataway Associates, Inc. v. Piscataway, supra, 73 N.J. at 551-552, 376 A.2d 527. The coefficient of deviation for that year was 10.21, indicating that substantial equality obtained in the taxing district. The appraisal expert for plaintiff candidly admitted that he was not sure that discrimination relief was appropriate in view of the nearness of the unweighted, unclassified ratio for that year to 100%. The testimony of plaintiff’s statistician indicated that for 1978, if all of the properties in the borough were sold, the assessment-sale ratio of each property, with a 99% degree of confidence, would fall between 90.24% to 97.34%. However, he could not indicate, statistically, whether these ratios would be at the lower or the higher end of the range. This is sufficiently close to 100% to warrant the denial of a ratio application for that year. It has been stated on a number of occasions that mathematical precision is not attainable in the valuation of property for assessment purposes, nor is it required. Baldwin Constr. Co. v. Essex Cty. Bd. of Tax., 16 N.J. 329, 342, 108 A.2d 598 (1954); In re Appeal of Kents, supra. Perfect relief is not possible. A taxpayer can only seek to obtain practical justice in the area of local property taxation. *507 Siegal v. Newark, supra, 38 N.J. at 61, 183 A.2d 210. A reduction of plaintiffs assessment to the true value as determined by this court affords practical justice for the tax year of 1978.
However, it is a different matter for the 1979 and 1980 tax years. I conclude that taxpayer has established that there was a common level of assessment within the taxing district for these tax years. The sales sample for 1979 consisted of 288 usable sales (3.2% of the total line items) which reflected an unweighted, unclassified ratio of 82.79%. The general coefficient of deviation for that year of 13.40 demonstrated that substantial uniformity existed in the tax district. Overall, the ratio study, ratio clusters and the coefficient of deviation indicate the existence of a common level considerably below 100% of true value. Plaintiff’s statistician amply demonstrated that if all the properties in the borough were sold during the testing period, he could determine with a 99% degree of confidence that any property sold would sell at an assessment-sale ratio of between 79.91% to 85.67%. The proofs lead this court inexorably to the conclusion that a common level did exist in the borough for the tax year of 1979, but this level was not 100%. Additionally, it should be mentioned that the borough did not contend that there was a weakness in the assessment-sale ratio because of a paucity or inadequacy of sales during any of the periods involved. Quite to the contrary, plaintiff’s statistician more than adequately established that the sales sample was of sufficient size to enable him and this court to make a reasonable statistical inference. The proofs did, indeed, overcome the presumptive correctness of the ratio prescribed by chapter 123 for the tax year of 1979.
For the tax year of 1980 I conclude, again, that plaintiff established that a common level of assessment existed within the taxing district. This determination is based on the sales sample of 76 usable sales which produced an unweighted, unclassified ratio of 75.13%. The general coefficient of deviation of 13.50 again demonstrates a relative uniformity in assessment for *508 1980. This conclusion was also influenced, in no small measure, by plaintiff’s statistician, who indicated that he could derive reasonable statistical results from a sample size of 30 sales and further by his indication that he could determine, with a 99% degree of confidence, that for 1980 any property sold would sell at an assessment-sale ratio of between 70.78% to 79.48%. In spite of a reassessment placed in effect for the tax year 1980, the sales ratio data indicated convincingly that defendant was not assessing at 100% of true value but at a level substantially less. Therefore, I conclude that plaintiff has overcome the presumption that the reassessment achieved a common level of assessment of 100%. See Piscataway Associates, Inc. v. Piscataway, supra. The proofs demonstrate that the reassessment may have achieved substantial equality (general coefficient of deviation of 13.50) but not at a level of 100% of true value.
It is my view that the Legislature, in providing that chapter 123 does not apply in the year in which a complete reassessment is made effective, did not intend to deny a taxpayer the opportunity to prove inequality in assessment by traditionally accepted means. Chapter 123 simply provides that a taxpayer may not rely on its terms to establish discrimination in the year of a reassessment, but this does not preclude an attempt to establish discrimination by other proofs. Although a complete reassessment may carry with it an indication of uniformity, it cannot be said that the Legislature intended to deny a taxpayer the right to demonstrate by competent proofs that uniformity was not achieved with respect to that taxpayer. If the proofs, for example, establish that the common level of assessment in a taxing district in a year of complete reassessment is only 50% of true value while the taxpayer is being assessed at a ratio to true value substantially in excess of 50%, this court could not justifiably refuse to apply an appropriate ratio to the taxpayer’s true value.
To summarize, I conclude that plaintiff is entitled to discrimination relief for only the tax years of 1979 and 1980. However, *509 I find, in the interest of stability of assessments and to increase the sales-sampling base, that the average of the three unweighted, unclassified ratios of 1978, 1979 and 1980 should be used to provide relief. The common level should not fluctuate from year to year. New Brunswick v. Division of Tax Appeals, supra 39 N.J. at 541, 189 A.2d 702. In Kents and New Brunswick the court allowed that consideration may be given to the average ratio of other years in order to insure that a ratio is “not grossly deceptive as a fair gauge of the ratio of assessment to market value.” In re Kents, supra 34 N.J. at 31, 166 A.2d 763. To that end, 83.90%, the average of the three unweighted, unclassified ratios, will be utilized to provide relief. See Feder v. Passaic, 105 N.J.Super. 157, 251 A.2d 457 (App.Div.1969). But see Tom-kins Tidewater Terminal v. Kearny, 1 N.J.Tax 590, 597 (Tax Ct. 1980).
Judgment will be entered adjudicating the assessments to be as follows:
1978
Land $ 810,000
Improvements 6,190,000
Total $7,000,000
1979
Land $ 700,600
Improvements 5,508,000
Total $6,208,600
1980
Land $ 738,300
Improvements 5,470,300
Total $6,208,600

The terms “revaluation” and “reassessment” at one time were used interchangeably. However, at present, they have separate meanings. A revaluation is conducted by an outside professional appraisal firm under contract with a taxing district, while a reassessment is primarily an adjustment of a previous revaluation or reassessment performed by the tax assessor and his staff. Handbook for New Jersey Assessors (June 1980 rev.), § 801.13.

it is noteworthy that defendant offered no proof of land value.

Special purpose property has been defined as, “A property devoted to or available for utilization for a special purpose, such as a clubhouse, a church property, a public museum, a public school, and so on. It also includes other buildings having value, such as hospitals, theatres, breweries, etc., which cannot be converted to other uses without large capital investment.” Boyce, Real Estate Appraisal Terminology (1975), 194.

Professor William N. Kinnard, Jr. is of the opinion that comparable properties may be located at a substantial distance from the subject, particularly in the case of industrial real estate. This is especially true when dealing with limited-purpose industrial real estate. Kinnard, Messer and Boyce, Industrial Real Estate (3 ed. 1979), 421-422.

In this regard, see Albritton, “Valuation of Special-use Property Types,” The Appraisal Journal (July 1980), wherein the author distinguishes between truly special-use property and limited-market property which is not special-use. He indicates that an erroneous classification of a limited-market property type as special-use could lead an appraiser to rely solely on the cost approach when market data are available for a complete valuation analysis.

For an explanation of the methodology of the Director of the Division of Taxation in arriving at weighted and unweighted ratios and their use in local property tax assessment, see Gaynes v. Edison Tp., 2 N.J.Tax 500, 179 N.J.Super. 373, 432 A2d 127 (App.Div.1980). Cf. Willingboro Tp. v. Burlington Cty. Bd. of Tax., 62 N.J. 203, 300 A2d 129 (1973).

The original provision of chapter 123 prescribed the use of a one-year unweighted, unclassified assessment-sales ratio. This ratio was utilized for the tax year of 1978. The statute was amended to provide that the ratio *506 promulgated by the Director of the Division of Taxation for school aid purposes (Director’s ratio) would be applied to the 1979 tax year and thereafter. I,. 1979, c. 51.