LARIO, J.T.C.
These are consolidated 1981 and 1982 local property tax appeals wherein plaintiff seeks direct review of its assessments pursuant to N.J.S.A. 54:3-21 on its property located at 861 Sloan Avenue, Hamilton Township, New Jersey designated on the tax map as Block 89, Lot 2. The property was assessed for each of the tax years at land $502,800, improvements $2,822,200 for a total of $3,325,000.
The subject property is a massive industrial complex situated on, as stipulated, a 62.2-acre irregularly shaped industrial site located in the northwestern section of Hamilton Township, Mercer County, in close proximity to the City of Trenton and *440 Lawrence Township. The township is located in the Philadelphia-New York corridor with access to such roadways and road networks as Interstates 95, 295, 195, the New Jersey Turnpike, Route 130 and U.S. Route 1. All areas of Mercer County including Hamilton Township are adequately serviced by railroad facilities. The subject property is located in the industrial-1 zone with a neighborhood predominately comprised of light to medium industrial facilities. It is a permitted nonconforming use because it exceeds the height limitation of 35 feet and 100-foot front-yard setbacks as is required by the present zoning. In all other respects the use conforms.
The complex was built in various stages between 1920 and 1950. The original construction began in the 1920’s by the then owner, W and J Sloan Manufacturing Company, for the purpose of manufacturing asphalt tile flooring. During the early 1950’s the facility was acquired by plaintiff, Congoleum Corporation, who continued to manufacture asphalt flooring until the process and product became obsolete. Subsequently, Congoleum invented the current resilient flooring process which is presently being used in the manufacturing of six-foot length flooring at this facility.
The improvements consist of 32 major sets of structures which are in reality three single inter-connected major buildings used for warehouse storage and manufacturing with additional detached buildings such as warehouses, pump stations and storage facilities. The buildings which make up the site are a conglomeration of one-story, two-story and three-story interconnected structures. In addition the subject property is improved with a reservoir for a sprinkler system, railroad siding, parking areas and fencing. Of the complex’s total of 971,107 square feet, it was stipulated at the beginning of the trial that 785,391 square feet of building area were usable and 185,716 square feet were obsolete.
The sole issue presented for determination is the true value of the property. The parties stipulated that if the property qualifies for relief under N.J.S.A. 54:51A-6 (popularly known *441 as Chapter 12E) that in determining the common level ranges the Director’s ratios to be applied are 81% for the tax year 1981 and 74% for the tax year 1982. N.J.S.A. 54:l-35a. Plaintiff alleges that the true value of the total complex as of both assessing dates was $2,300,000 whereas the taxing district claims it was $4,500,000.
In support of their respective positions each party presented the testimony of well-qualified real estate appraisers, Michael J. McCloskey, Jr. for plaintiff and Ronald A. Curini for the municipality. Both experts were in agreement that the highest and best use of the subject property for the tax years in question was its then current use as a manufacturing, industrial-warehouse complex, however, they differed widely as to the true value of this facility which admittedly is most difficult to appraise. In arriving at his concluded true value of $2,300,000 McCloskey considered both the cost and market approaches to value, each of which indicated a true value of $2,300,000. Curini considered all three of the accepted approaches, whereby he arrived at a depreciated cost value of $6,000,000, an income value of $4,350,000 and a market value of $4,700,000. He accorded the most weight jointly to the income and market approaches thereby concluding $4,500,000 as his final true value.
 On a direct appeal to this court the local tax assessment made by the local taxing authority is presumed to be correct and the burden is upon the party seeking to upset same to prove otherwise. Aetna Life Insurance Co. v. Newark, 10 N.J. 99, 105, 89 A.2d 385 (1952); Texas Eastern Transmission Corp. v. Carteret Boro., 116 N.J.Super. 9, 280 A.2d 833 (App.Div.1970), aff’d 58 N.J 585, 279 A.2d 674 (1971), and the presumption is overcome only by the introduction of sufficient competent evidence to enable this court to determine the true value of the property. Aetna Life Insurance Co., supra, 10 N.J. at 104-105, 89 A.2d 385; Passiac v. Botany Mills, Inc., 59 N.J.Super. 537, 543, 158 A.2d 205 (App.Div.1960), Riverview Gardens v. N. Arlington Boro., 9 N.J. 167, 175-176, 87 A.2d *442 425 (1952). This presumption also applies to a taxing district seeking an increase. Ibid.
Each of the experts presented a comprehensive and detailed analysis which together with their testimony was sufficiently supported to enable the court to determine the value of the property; therefore, since sufficient competent evidence has been produced by each party, the presumption of correctness has been overcome. See also Evid.R. 14 (Anno.1985) Note 3 thereunder.
 It now becomes incumbent upon this court to appraise the conflicting testimony, make a determination of true value and fix the assessment. Rodwood Gardens, Inc. v. Summit, 188 N.J.Super. 34, 455 A.2d 1136 (App.Div.1982), Rek, Inv. Co. v. Newark, 80 N.J.Super. 552, 194 A.2d 368 (App.Div.1963). At this posture of the case each party has the respective burden of ultimate persuasion to prove to the satisfaction of this court that the ratio of the assessed valuation of the subject property to its true value exceeds the upper limit or falls below the lower limit of the common level range. N.J.S.A. 54:51A-6. This court is free to supplant the assessment “if satisfied to that end by a preponderance of what it deems the worthier proofs.” Passaic, supra, 59 N.J.Super. at 545, 158 A.2d 205; N.J.S.A. 2A:84A-5.
There is no single doctrinaire approach to the valuation of real property. Samuel Hird and Sons, Inc. v. Garfield, 87 N.J.Super. 65, 208 A.2d 153 (App.Div.1965). The choice of the predominate approach will depend upon the facts. New Brunswick v. Tax Appeals Div. of N.J., 39 N.J. 537, 189 A.2d 702 (1963).
In arriving at his cost value McCloskey valued the improvements at a reproduction-cost-new of $34,809,204 and depreciated them by 95%—$33,068,743. Curini’s cost-depreciation percentage was not significantly less. He separated the buildings into 20 groupings which he then reproduced and depreciated. One group was depreciated at 85%, nine at 80%, seven at 70%, *443 two at 60% and one at 40%. In this approach, McCloskey first established reproduction-cost-new. He then determined total depreciation by subtracting therefrom his calculated improvement residual which he obtained from his market approach conclusion (less contributing value of the land). It is apparent that this is a mathematical computation that will always result in a final depreciated cost value equal to his market value and that it is only as valid as the correctness of his market value conclusion. Curini stated he could not extract a depreciation rate from the market; he merely included depreciation from all sources in one rate without adequately detailing his calculations.
The cost approach to value is a viable indicator of value when the improvements are new and all forms of depreciation are measurable. American Institute for Real Estate Appraisers, The Appraisal of Real Estate (7 ed. 1978) 323. “Replacement cost has been recognized as mere evidence of value—fallible evidence at that.” 1 Bonbright, Valuation of Property, 150. However, when depreciation cannot be reliably measured the cost approach can lead to a distorted result. Id. at 175-176. The calculation of depreciation as applied to a property of fairly recent construction presents a baffling problem of appraisal technique. Id. at 161. To calculate it for improvements which are extremely old, obsolete and which would never be replaced in their original condition is almost impossible. It is quite obvious that utilization of the cost approach to value buildings as old and varied as the subject, which require such enormous depreciation percentages, cannot be relied upon. The court gives no weight to the cost approach submitted by either party.
The value concluded by the income approach, which was not considered by the taxpayer but utilized by the taxing district, is not entitled to much more weight. The subject is owner-occupied, exceedingly large and admittedly almost impossible to lease to a single tenant. To project a tenancy, a potential investor would be required to subdivide the buildings which would entail large costs. The amount of available indus *444 trial space in the area is substantial, therefore, even after alterations, an investor intending to let would be faced with strong competition. In attempting to establish an economic rent Curini admitted in his appraisal report “since most large plants in the Mercer county area are owned by large corporations, there are no large rentals available.” Nevertheless, he continues to state: “if the plant was available for lease, the following rentals would be applicable.” He then listed four rentals ranging from 81$ to $2.33 a square foot and concluded without detailing either their comparability or his adjustments that “allowing for an increase in the inflation” (which figure was not given) the subject property would lease for 75$ a square foot on a “net net” basis. In New Brunswick, supra, our Supreme Court warned of the pitfalls connected with the use of the income approach to ascertain true value stating: “But the problems to which we will now refer suggest the care with which the income method must be used and indicate as well that one should hesitate to accept its answer without checking against all available data.” Id., 39 N.J. at 544, 189 A. 2d 702. As pointed out in The Appraisal of Real Estate, supra:
In the review and analysis of the factual data, comparison is made with known rentals for similar space in the same or comparable locations, [at 325; emphasis supplied]
Regardless of what procedures are used to develop the economic income projection, the objective is a reasonable estimate of the rent that the property would command, for the foreseeable future, if the space were currently available for rent in the open market. This prospective gross income estimate (before provision for vacancy and possibly rental collection loss) is also referred to as gross rental or potential annual gross income.
Translating this income estimate to a value indication is an appraisal procedure but this procedure cannot produce a satisfactory conclusion unless the starting point is a logical estimate of the probable quantity of future income, [at 328]
I find that the rentals utilized by defendant are from properties which have not been established as comparable to the subject nor does the expert so claim them to be, therefore, they are purely speculative. In sum, I find that there has been a *445 failure to prove the fair rental value of the property as of October 1, 1980 and October 1, 1981, therefore, the economic approach to value cannot be considered in establishing this property’s true value. Parkview Village Assoc. v. Collingswood, 62 N.J. 21, 29-30, 297 A.2d 842 (1972); First Real Estate Investment Trust of N.J. v. Hasbrouck Hgts., 190 N.J.Super. 85, 461 A.2d 1210 (App.Div.1983), Rodwood Gardens, Inc. v. Summit, supra, 188 N.J.Super. at 38, 455 A.2d 1136.
From a total analysis of the evidence presented I find the market data approach based on the square foot system of comparable sales of industrial real estate, which was utilized by both experts, to be the more persuasive in arriving at the subject’s true value. Valuation of industrial property by sales comparisons of like properties gives the best indication of market value. Kinnard, Messer and Boyce, Industrial Real Estate (3 ed. 1979) at 445. The market data for the appraisal of industrial property entails the locating of recently sold properties having substantial similarity to the subject property so as to admit of reasonable comparison, ascertaining the selling price, and then by comparison and adjustments, estimating the square foot value of the appraised property.
In McCloskey’s opinion, in the valuation of large industrial property such as the subject, size is a critical issue, if not the most important factor of all, therefore, the sales of large industrial properties should be utilized no matter where located. In accordance with that theory he considered five national sales together with seven that he selected from the Mercer County area which he utilized in his appraisal. Conversely, Curini used only local sales claiming that, although use of national sales might be proper under the right circumstances, for the valuation of the subject for ad valorem tax purposes the method was unreliable and, additionally, that there were a sufficient number of comparable local sales from which a true value could be extracted for the subject. Accordingly, he utilized five sales of suburban industrial facilities in Mercer County in arriving at his conclusion of true value.
*446 Evidence of comparable sales is effective in determining the value of property for tax purposes where there is a substantial similarity between those sales and the subject property so as to admit of reasonable comparison. Venino v. Carlstadt Boro., 1 N.J.Tax 172 (Tax Ct.1980), aff’d o.b. per curiam 4 N.J. Tax 528 (App.Div.1981). While it is generally true that the sale should be located within the subject’s general area, where the property being valued is industrial, sales of industrial plants may not be summarily rejected as comparables solely by reason of their out-of-county or out-of-state location. Sunshine Biscuits, Inc. v. Sayreville, 4 N.J.Tax 486, 496 (Tax Ct.1982). Nevertheless, the sales should be of facilities comparable to, and not too remote from, the subject property—“the process of comparison must be based on sales that reflect typical market actions within the market in which the property would be sold. Ibid.; The Appraisal of Real Estate, supra at 274-275.
In Sunshine Biscuits, supra, plaintiff’s expert utilized eight large industrial plants located generally between northern New Jersey and the metropolitan Philadelphia area. There the court specifically found that the eight sales were clearly within the market in which its Sayreville subject property would be sold. Id. at 496.
Of the five non-local sales presented here, two were located in the state of Ohio, one in the vicinity of Pittsburgh, one in Cressona, Pennsylvania, and the fifth in the Conshohockan-Philadelphia area. McClosky analyzed the selling price of these properties which ranged from a low of $1.35 to a high of $4.06 a square foot of the gross building area including land. He considered only three of the sales which reflected unit rates of $1.35 to $2.36 a square foot before adjustment. He then determined that “size is a critical consideration and the New Jersey sales had to be adjusted to compensate for this factor. No adjustment is warranted in the national sales, which by the unit rates, prove conclusively, that physical size is a major factor in establishing market value.”
*447 Thereupon he concluded “after taking into consideration all of the similar and dissimilar features between the subject and all of the sales analyzed ... a value of $2,300,000 equivalent to $2.29 a square foot of the gross building area including the land.” However, he failed to itemize the “similar and dissimilar features” and what adjustments were made.
Although large physical size is an important consideration in appraising this property, its other features must also be considered. In addition to the usual problems associated with the ordinarily required adjustments for age, time, obsolescence, use of these out-of-state sales as comparables presents extraordinary problems, such as, different state tax levies and benefits, right-to-work laws, unionization and labor market, shipping costs and market access. The further away the considered national sales are from the subject, the greater the likelihood of error. The national sales utilized by plaintiff represent mainly old industrial buildings formerly used as World War II defense plants and steel mills. Plaintiff has failed to document what consideration was given to the above-itemized factors and what adjustments, if any, were made. It is apparent that in comparing his out-of-state sales McCloskey relied mainly, and possibly solely, upon a size factor adjustment formula of roughly 2% per 100,000 square feet. In this case I find this method to be insufficient. To adjust these sales to the subject mainly upon a size formula would be highly speculative.
I further find that plaintiff has failed to adequately establish that there exists a substantial similarity between the national properties utilized by plaintiffs expert and the subject property so as to admit of reasonable comparison and it has also failed to document that these sales were clearly within the market in which the subject would be sold.
The seven local sales utilized by McCloskey to arrive at his market value of $2,300,000 and the five sales relied upon by Curini which resulted in his indicated market value of $4,700,-000 are summarized as follows:
*448 os ca . ■ w . O <y Ol ol H o H w SI W og a o *3 Ph «3 O o9 «a S03 a ¡z a5 i . <y o co ta « <1S cog o §3' HI ol ?*g| S&á íál S.ss J & w iHO C - n ol OT 5 «¿3* <¡ i B gí § S c o sSi, g 9 Ik o a k Pi 0) *~5 «5 0) «a 2 wa ^ ¿3* a & « •Sft g S gu o— 4) ^ £ g H K S * COO a> .Bj c a © 9 O w g 6 1° § It o ft O ft ' f •S ÍS M ¡-«¡11$! g ^ 8 ft O HOS to ’ £ 3 •
*449 COMPARATIVE RATING GRID <D P d Ph g ■§ £ a -2 £ 03 O £EHC bo sx 5 lQ) © w .a «W «H 03 03 «3 —S © t-H © CO 2; © © © <© ^ © © ^ cq ^ © id" CM CO © IQ ^ © i—l CM ¡ H CO fc- © 1—1 60- ^ ^ ^ © 2 ID 2 ID ID -v g. , + 03 + <1> I I Ph 3! fc§ zn S| «W «H g 02 02 C3 © id © oo £" © © ID t- ® © CM 00 ID 00 CO © t- © t-60-CD ,5 Oh a Eh a ¡ p¡ rrj © © id -.$?©© co I ; W ; © IQ ^ © © có' OÍ CO © © CO rH © © CO cg a 10 a a £ ^ © , a4 a4 | + 0) + 0) a> [ ^ d © © ID 2 © LD rH ©CM CM I + + 8| I g © 03 03 a © ID © CO © © IQ tfc- © CM 00 d ^ io 2 © to CM CM q ce as 3 a10 a 7 a4 © I <u + a> I I Sa a W © 03 02 02 CM ~ O CO ID 00 © C3 \ fc- t— © N C5 © t-co- IjoT co' CO 6*9- CO CM CM fcjr ■ts *R -3 íR sR 2 io 2 io o g* , g-1^^ 0) -h <D I I ^ -Í a zn 0> n M CO a a ® 02 Ph bb & «< .53 J* ^ p t> z/1 Ph So o 0) £h ^ ü "d w ^ D 4¡ a «lí gg CO CO 41 O J CO H <U ?> 4_> O a *e p Pk *1 a Jj o <! 43 a bo Ü T3 d a o U as ® H-> bo P <J bb bb d d m bo ¡ S55« Land Value: _ equal_— 5%_equal_—5%_—25% TOTAL ADJUSTMENTS: -50%_-55%_-35%_-15%_-60% INDICATED PAIR MARKET VALUE PER SQ. FT. LAND & BUILDING MERGED: $ 7.37 $ 5.97 $5.02 $6.71 $ 6.70
*450 As previously stated, evidence of comparable sales is effective in determining the value of property for tax purposes where there is a substantial similarity between those sales and the subject property so as to admit of a reasonable comparison.
Cross-examination by respective counsel and rebuttal testimony presented by each party has raised serious doubts as to the substantial similarity of plaintiffs sales numbers 1, 2, 3, 6 and 7 and defendant’s sales numbers 1, 2 and 5.
Plaintiff’s sale number 1 (P-1) was a sale by Westinghouse Electric who had used the building as a warehouse for the storage of light bulbs. No manufacturing was done there. The building’s floor load capacity was only 150 pounds a square foot as opposed to the 500 pound a square foot commonly required for normal warehousing activity. It had no parking facilities and its access roadways for heavy truck traffic appeared to be inadequate. It does not properly compare as a manufacturing-industrial building.
Plaintiff’s sale number 2 (P-2), prior to its sale, had been vacant for quite some time. At sale time 25% of the property had no flooring, questionable utilities and it was in an extremely vandalized condition which required substantial renovations (approximately $150,000) which were installed by the buyer after purchase.
Plaintiff’s sale number 3 (P-3), is located in a heavily urbanized area with practically no parking available for employees which would be required for a manufacturing, industrial operation. At the time of sale this property’s second and third floors had very little usability and $700,000 had to be spent for renovation without which the property could not be effectively utilized. Plaintiff’s next sale, identified as sale 3 and 4 (P-3 & 4), although listed as a single sale, is a combination of sales numbers 3 and 4 which occurred separately and should be appraised separately as was additionally done by plaintiff. Its use in combination leads to great speculation.
*451 Plaintiff’s sale number 6 (P-6) is located in a heavily urbanized congested area of the City of Trenton. The upper floors had been vacant for an extended time prior to sale and at the time of sale the property had been extremely vandalized. McCloskey’s allocation of a plus 50% adjustment for location implicitly recognizes this factor and its extremely low sale price of $1.09 a square foot substantiates its poor condition.
Plaintiff’s sale number 7 (P-7) is also located in the City of Trenton and suffers from many of the problems attributable to P-6. The property was in very poor condition, subject to constant flooding and the heating system was inoperative. Its sale price of 66c a square foot plus McCloskey’s adjustment of 100% for utility and 70% for location establish its lack of similarity.
Defendant’s sales numbers 1, 2 and 5 (D-l, D-2, D-5) all suffer from the same deficiencies as plaintiffs’ sales in that each sold at an extremely high per square foot sale price compared to the subject’s proposed value thereby raising serious doubts as to their comparability. The appraiser must always compare like with like; the greater the number and percentage of adjustments to be made, the less reliable is the alleged comparable.
D-l sold for $14.73 a square foot, D-2 at $13.27 a square foot, and D-5 at $16.76 a square foot. These properties appear to be far superior to the subject. In order for Curini to place any reliance on these sales he adjusted them at minus 50%, minus 55% and minus 60% respectively without adequately supporting his adjustments with objective data. I find his adjustments for the sale of these properties lacking in authoritative weight. The weight to be given an expert’s opinion depends upon the facts and reasoning which form the basis for that opinion. In re Port of New York Auth., 28 N.J.Super. 575, 581, 101 A.2d 365 (App.Div.1953); Dworman v. Tinton *452 Falls, 1 N.J.Tax 445, 448 (Tax Ct.1980). Additionally, D-2, which occurred in December 1981 is a resale of 2720-2770 Brunswick Pike (U.S.Rt. # 1), Lawrence Township which had previously sold in July 1979. (This latter sale is referred to by plaintiff as P-5 and as D-4 by defendant.) Subsequent to the July 1979 sale and prior to its resale, 30,000 square feet of new space was added and it does not appear that Curini gave proper consideration to this addition—approximately a one-third increase in size. Although, in his adjustments for the first sale of this property (D-4), he alloted plus 5% to the building’s amenities and minus 25% for building size, in its second sale (D-2) which had since been improved by a new addition of 30,000 square feet, he made no change in either of these categories nor did he explain his failure to do so.
Both McCloskey and Curini used two identical sales in their respective market analysis; the May 1981 sale of Johnston Avenue, Hamilton Township, (analyzed by plaintiff as P-4 and by defendant as D-5); and the July 1979 sale of premises 2720-2770 Brunswick Pike (U.S. Rt. # 1), Lawrence Township, (utilized by plaintiff as P-5 and by defendant as D-4). As previously stated, the 2720-2770 Brunswick Pike, Lawrence Township sale is the identical property which was improved with a 30,000-square foot addition and resold in December, 1981. (The resale was utilized as a comparable by defendant (D-2) but rejected by this court as previously expressed.)
The Johnston Avenue, Hamilton Township property containing 103,500 square feet sold in May 1981 for $800,000 indicating a merged-square foot price of $7.73 which is the figure utilized by both experts. Plaintiff’s adjustments consisted of minus 18% for size, minus 30% for age/loeation, plus 4% for land to building ratio, minus 30% for utility and plus 5% for location, a total adjustment of minus 69% to arrive at an indicated rate of $2.40 a square foot. Defendant adjusted the sale price by a total of minus 35% itemized at minus 5% for time, plus 10% for location, plus 5% for amenities, utility equal, minus 20% for age/condition, minus 25% for size and land value equal. Apply *453 ing the minus 35% total adjustment results in defendant’s indicated rate of $5.02 a square foot.
The Brunswick Pike (U.S. Rt. # 1), Lawrence Township property (sale P-5 and D-4) sold in July 1979 for $775,000. McCloskey calculated a sale price of $7.86 a merged-square foot based upon building area of 98,615 square feet while Curini, utilizing 98,065 square feet, computed it to be $7.90. McCloskey adjusted his sale price for this property by plus 5% for time, minus 18% for size, minus 25% for age/condition, minus 7% ratio land to building, and minus 25% utility for a total adjustment of minus 70% to arrive at an indicated rate of $2.36 a square foot. Curini adjusted plus 10% for time, plus 5% for building amenities, building utility equal, building/age condition equal, minus 25% for building size and land value minus 5% for a total minus 15% adjustment resulting in an indicated rate of $6.71 a square foot.
It is amazing that two well-qualified appraisers in adjusting an identical sale came up with such divergent total adjustments—a minus 70% for one and a minus 15% for the other which results in one expert’s valuing the sale at almost three times the opposing expert’s value. The greatest discrepancy is in their respective age/condition and utility adjustments. Plaintiff allocated minus 50% compared to defendant’s “0” for these two items.
I find from McCloskey’s testimony and the photographs submitted by him concerning this property’s original sale, that he did not examine it until after a substantial portion of the renovations had been installed, therefore, his minus 50% for these items is not based on personal knowledge of the physical condition of improvements as it existed on the date of the first sale; nor did he secure accurate facts concerning same.
I am equally convinced that the same conclusion applies to Curini’s consideration. Curini proposed both the original and the resale of this property as comparables and although the building was increased by 30% new construction between the first and second sales, he added only 20% to his building *454 age/condition adjustments between the first and second sales. Additionally, as previously noted, he adjusted minus 25% building size for the first sale but, after a 30% addition, in his adjustments for the resale he made no change in his building size utilizing the same 25% and his building amenities remained at plus 5%. Curini’s failure to adequately explain his reasoning for practically ignoring the addition detracts immeasurably from the weight he attributed to the original sale as well as the resale. My conclusion that neither expert was in possession of accurate facts concerning the physical condition of the property at the time of its first sale may further explain why they were not in agreement on the building’s original square footage. For the above reasons, I place no probative value to either expert’s testimony concerning the Brunswick Pike, Lawrence Township sales. Additionally, because the above property is not located in the same taxing district as the subject whereas the Johnston Avenue property is so situated; and since the experts’ respective adjustments for the Johnston Avenue sale are closer percentage-wise, this court will rely most heavily upon the Hamilton Township comparable in calculating the subject’s true value.
As earlier noted, both experts attributed a sale price of $7.73 a square foot for the May 1981 sale of the Johnston Avenue, Hamilton Township property. Both experts agreed that this sale is a usable comparable and that the property is superior to the subject. They also substantially agreed to the overall percentage of adjustment to be made with the exception of the adjustment for building utility and amenities. Comparing the adjustments made by each for time, location, building age/condition, building size and ratio of building to land, discloses that McClos'key arrived at an overall adjustment of minus 39% and Curini at minus 40%. Not included therein is McCloskey’s additional adjustment of minus 30% for building “utility” and Curini’s additional plus 5% for building “amenities.”
In his appraisal report Curini does not define “amenities” nor does he explain in what context he utilized this adjustment. In The American Institute of Real Estate Appraisers, Real Es- *455 tale Appraisal Terminology, (1975), “amenities” is defined as “the pleasant satisfactions that are received through using rights in real property but that are not received in the form of money. The tangible and intangible benefits generated by a property.” Id. at 9. It does not appear that Curini used this definition as criteria for making this adjustment, however, there is some indication that his use of “building amenities” referred to a comparison of office space to total building size. In either use, Curini has not presented any explanation, data or basis for his raw subjective conclusion of plus 5%.
McCloskey defined “utility” as follows: “Utility is based on the functional difference between the subject and sales, i.e., ceiling height, number of buildings, subdivision utility, story height and general industrial amenities.” Exactly what is meant by this explanation is not clear. He does not state what effect the ceiling height had upon his adjustment. The sale and the subject are both being compared on a square foot basis and not cubic feet. Normally in a warehouse, manufacturing/industrial plant, high ceilings up to a certain height are desirable; at what height and to what extent high ceilings of the subject have a significant negative factor is not shown.
“Subdivision utility” as used by the experts in this case refers to the ability to subdivide a large property for multi-tenants. A prime consideration for subdivision is the availability of parking facilities for the multi-tenants, their employees and customers, therefore, it is advantageous to have either a large land-to-building ratio or the availability of sufficient off-site street parking, or both. It was testified that the subject has a better land-to-building ratio and better off-street parking facilities than the comparable but McCloskey did not explain how he presumably rated the comparable’s subdivision utility as superi- or to the subject.
Additionally, what is meant by “general industrial amenities” is a complete mystery. This classification is not defined by McCloskey nor have I been able to find a specific meaning for it in any of the recognized reference books.
*456 In his definition, MeCloskey states that “utility is based on the functional difference.” It is unquestionable that the subject property has functional obsolesence. The fact that defendant stipulated that various sections of the complex totalling 185,716 square feet, more than 18% of the total property, were obsolete and not to be included in the final true value is an acknowledgment of the subject’s substantial functional obsolesence. An examination of McCloskey’s appraisal report discloses that in appraising the subject property he considered it as consisting of 991,743 square feet of gross floor area (in his general description contained in his appraisal) and 1,002,343 square feet of usable improvements (as utilized in adjusting for his comparable sales). Although at trial only 785,391 square feet of the building were agreed to have value, MeCloskey did not adjust his figures accordingly.
In comparing the subject property to sales, MeCloskey utilized 1,002,343 square feet for the building area as confirmed by his “Schedule of Sales” chart. Obviously in calculating his minus 30% adjustment for building utility of the Johnston sale, MeCloskey was comparing the sale to the full area including the unusable area.
I find that the negative effect attributed to the subject property for “utility” as defined by MeCloskey was mainly eliminated by defendant’s stipulation which was accepted by plaintiff. Plaintiff cannot have the benefit of both the elimination from consideration of value of the obsolete part of the building and a functional depreciation claim for the same portion.
I find that neither party has established by a preponderance of the evidence that either the plus 5% for building amenities or the minus 30% for building utility should be utilized in adjusting this sale; therefore, this sale will be adjusted by a total of minus 40%, which results in an adjusted sale price of $4.64 a square foot.
Based upon the above findings of fact, I conclude that this adjusted sale price reflects the true market unit value of *457 the subject property. Applying $4.64 a square foot to the agreed 785,391 square feet results in a true market value for the subject property of $3,644,214.24 which will be rounded to $3,644,200. Since this true value is outside the corridor permitted by Chapter 123, plaintiff is entitled to the relief directed therein. Accordingly, applying the agreed Chapter 123 ratio of 81% dictates an assessment for the tax year 1981 of $2,951,813 and applying the agreed ratio of 74% dictates an assessment for the tax year 1982 of $2,696,708.
In accordance therewith, the Clerk of the Tax Court is directed to enter judgment (rounded) as follows:
1981:
Land: $ 502,800
Improvements: $2,449,000
Total: $2,951,800
1982:
Land: $ 502,800
Improvements: $2,193,900
Total: $2,696,700