CRABTREE, J.T.C.
These are consolidated local property tax cases wherein plaintiff seeks review of the 1988 and 1989 assessments on its property located at 223 West Side Avenue, Jersey City, New Jersey (Block 1286, Lot 4B). The 1988 complaint was a direct appeal pursuant to N.J.S.A. 54:3-21, while the 1989 complaint was an appeal from a judgment of the Hudson County Board of Taxation affirming the assessment.
The assessments were:
1988 1989
Land $1,3487900 $2,4527600
Improvements 1,878,000 1,878,000
Total $3,226,900 $4,330,600
At issue are the true value of the subject property, whether plaintiff is entitled to discrimination relief in 1988, a revaluation year, whether plaintiff is entitled to discrimination relief pursuant to c. 123 for 1989, and whether plaintiff is entitled to relief from a so-called spot assessment for 1989.
*134 The subject of the controversy is a complex of 15 individual buildings, largely owner-occupied, situated on 11.65 acres of land and bounded on the west by Route 440, on the east by West Side Avenue and on the north by Carbon Place. Aecess to the property is from West Side Avenue. The buildings, constructed between 1900 and 1967, contain, in the aggregate, 141,218 square feet. Approximately 101,500 square feet are devoted to warehouse use. Another 11,746 square feet are devoted to warehouse and manufacturing use, while 1,800 square feet are devoted exclusively to manufacturing. One of the buildings, a warehouse built in 1917, is a two-story structure, while two other buildings, built in 1930 and 1956, are part one-story and part two-story structures. The newer of the two is in poor condition and is out of service. The older building contains two low-pressure oil burners and one low-pressure boiler utilized to provide heat for the complex and for the manufacturing process.
The office building and garage, built in 1967 and containing 9,753 square feet, are leased in their entirety to Jersey City State College for five years, commencing in 1987, for $10.50 a square foot, gross. The annual rental is $102,405. All other buildings in the complex, to the extent they are occupied at all, are owner-occupied.

Valuation.

Plaintiff’s expert estimated the true value of the subject property on October 1, 1987 and October 1, 1988 to be $2,600,-000 and $2,700,000, respectively.[1] In developing these conclusions he utilized the income and sales comparison approaches to value, with principal reliance upon the former.
In the development of his income approach he posited economic rent to be $442,920, assigning various unit rentals to the buildings in the complex on the basis of 27 leases in industrial *135 buildings located in Jersey City and North Bergen. He estimated vacancy and collection loss to be 5% of gross income; he estimated expenses to be $79,701 consisting of $25,000 insurance, 5% for repairs, 5% for management, 2% for legal and accounting and 1% miscellaneous. The net income was $341,-073, which he capitalized under the band of investment, mortgage-equity method at 13.24%, including an effective tax rate of 2.24%, to arrive at a true value for 1988 of $2,576,000, which he rounded to $2,600,000.
For 1989 the expert increased economic gross income by 7.5%. The vacancy allowance and all expenses, except insurance, were estimated to be the same as the prior year; the insurance expense was increased 10%. His capitalization rate was the same except for the effective tax rate, which was 2.57%. The net income was estimated at $366,028, which, capitalized at 13.57% produced a true value for 1989 of $2,697,-500, rounded at $2,700,000.
The expert’s comparative approach consisted of one sale, in North Bergen, of a complex of ten one- and two-story buildings constructed some 60 years ago. The sale took place on December 31, 1986 and the consideration was $1,750,000, or $14.04 a square foot. The expert adjusted for time and land area (the comparable was located on 3.34 acres), arriving at an adjusted sale price of $18.75, which applied to 141,218 square feet of improvements produced a true value estimate of $2,577,200 for 1988. For 1989 the expert simply added 5% to arrive at a true value estimate of $2,676,000 under the comparative approach.
Defendant’s expert estimated the subject’s true value to be $4,250,000 for 1988 and $4,675,000 for 1989. In arriving at these estimates he utilized both the income and comparative approaches, relying upon both in equal measure.
In the development of his income approach he posited economic rent to be $471,892, assigning various unit rentals to the buildings in the complex on the basis of four leases in industrial buildings located in Jersey City and the contract leases on the office building and garage. He estimated vacancy and collec *136 tion loss at 5%, insurance expense at $25,000, management and leasing at 5% and repairs and maintenance at 5%. The net income resulting from these calculations was $378,467, which he capitalized at 13.48%, using the band of investment mortgage-equity technique, to arrive at a rounded true value estimate of $2,807,600 before the addition of a value estimate for 5.3 acres of excess land.
The expert’s sales comparison approach consisted of five sales of industrial buildings. Only one of the sales involved a complex of more than two buildings; and that sale was the same ten-structure North Bergen complex utilized by plaintiff’s expert. Two of the sales involved properties with one building; two other sales involved properties with two buildings. The vintage of all the comparable sale properties was the same as the subject. The expert estimated the true value under the sales comparison approach to be $3,048,000, exclusive of the value of 5.3 acres of excess land.
Under both the income and comparative approaches defendant’s expert, utilizing six vacant land sales, concluded the value of 5.3 acres of excess land to be $250,000 an acre, or $1,325,000.
Thus, the expert estimated the 1988 true value under the income and comparative approaches to be $4,132,600 and $4,373,000, respectively, which he reconciled at $4,250,000, as stated above.
While the expert submitted no written appraisal for 1989 he testified that his true value estimate for that year would be 10% greater than his true value estimate for 1988.
The sales comparison approach utilized by both experts is not probative of true value. Plaintiff’s expert relied upon one sale, which he adjusted for time (5%) and inferior land area (25%). (The comparable sale’s land area was only 3.34 acres.) The magnitude of the adjustments is too large in view of the expert’s reliance upon only one sale. That sale, even without adjustments, provides insufficient proof of market action.
*137 Defendant’s expert made adjustments in his five improved sales ranging from negative 22% to negative 63%. The negative adjustment of 22% was net; the gross adjustment was 42%. The negative adjustment of 63% for another sale was also the gross adjustment. The magnitude of these adjustments vitiates comparability. Owens-Illinois Glass Co. v. Bridgeton, 8 N.J.Tax 495, 512 (Tax Ct.1986); Ford Motor Co. v. Edison Tp., 10 N.J.Tax 153, 176 (Tax Ct.1988), aff’d 12 N.J.Tax 244 (App.Div.1990) certif. granted 127 N.J. 290, 604 A.2d 580 (1991). Evidence of comparable sales is effective in determining value only when there is a substantial similarity between the comparables and the subject property so as to admit of reasonable comparison. Venino v. Carlstadt, 1 N.J.Tax 172 (Tax Ct.1980), aff’d o.b. per curiam 4 N.J.Tax 528 (App.Div.1981).
Before addressing the income approach employed by both experts, the court must resolve the issue of excess land.
Excess land is defined in an authoritative appraisal text as surplus land not needed to support the existing improvements. American Institute of Real Estate Appraisers, The Appraisal of Real Estate (9 ed. 1987) at 200. In some instances, the highest and best use of excess land may be for future expansion of existing or anticipated buildings; in other cases the use of excess land may be for future development as a separate entity. Id. at 290.
However, a large site is not considered to have excess land if the location and configuration of buildings thereon preclude expansion of such buildings or the construction of new ones. Id. at 291.
It follows from the foregoing that a land-to-building ratio which appears to be in excess of the land-to-building ratios prevailing in the subject’s market area is not necessarily indicative of excess land. Defendant’s expert, however, relied upon the subject’s land-to-building ratio as the basis for his conclusion of excess land, notwithstanding his disavowals to the contrary.
*138 Moreover, defendant’s expert asserted that the land area permitted expansion of the existing buildings. He failed, however, to consider the financial feasibility of expansion, the impact of zoning and construction codes, the size and type of the proposed construction or the possibility of a diminution in value from the loss of road frontage if a building were constructed along West Side Avenue.
Defendant’s expert has failed to make a case for excess land. The probative utility of an expert’s opinion stands or falls on the facts and reasoning offered in its support. Dwormann v. Tinton Falls, 1 N.J.Tax 445 (Tax Ct.1980), aff'd o.b. per curiam 3 N.J.Tax 1, 180 N.J.Super. 366, 434 A.2d 1134 (App.Div.1981).
This brings us to the income approach, which this court has found to be inappropriate in valuing owner-occupied industrial property. See Shulton, Inc. v. Clifton, 7 N.J.Tax 208 (Tax Ct.1983), aff'd 7 N.J.Tax 220 (App.Div.1984). In the instant case, however, approximately 72% of the buildings are devoted exclusively to warehouse use, and, as warehouses are commonly rented by their owners as investment property, as indicated by the comparable leases relied upon by both experts, the income approach is a viable method of valuing them. See New Cumberland Corp. v. Roselle, 3 N.J.Tax 345 (Tax Ct.1981).
The economic rent posited by plaintiff’s expert is more credibly supported by the comparable leases in evidence than the economic rent posited by defendant’s expert. Thus, the court finds the economic rent on October 1, 1987 to be $442,920. The experts agree on a 5% vacancy and loss allowance, a $25,000 insurance expense, 5% of effective gross income for repairs, and 5% of effective gross income for management. Plaintiff's expert posits an expense for legal and accounting of 2% of effective gross income and an expense of 1% of effective gross income for miscellaneous. Defendant’s expert makes no allowance for the latter two items. The court finds that all the expenses posited by plaintiff’s expert are reasonable and that *139 the economic net income for the subject property for tax year 1988 is $341,073, the conclusion reached by plaintiffs expert.
Both experts employed the band of investment mortgage-equity technique in formulating a capitalization rate; they also agreed on mortgage and equity positions of 75% and 25%, respectively. They differed insubstantially on both the mortgage constant and the equity rate. Plaintiff’s expert used a constant of 11.34%, producing a weighted mortgage component of 8.5%; defendant’s expert selected a constant of 10.9%, producing a weighted component of 8.18%, a mere 32 basis points less than plaintiff’s mortgage component. Plaintiff’s expert chose a 10% equity rate, compared to a 9% rate used by defendant’s expert. Given the 25% equity position assumed by both experts, the difference is only 25 basis points.
The paradox is that the total capitalization rate utilized by plaintiff’s expert (13.24%) is less than the capitalization rate chosen by defendant’s expert (13.48%). The difference is in the tax rate. The experts agree that the actual tax rate for 1988 was 3.05%. Defendant’s expert chose that rate as 1988 was a revaluation year, in which c. 123 is inapplicable and all properties are presumptively assessed at true value. Plaintiff’s expert, however, concluded, on the basis of his own two-year ratio study, that properties were assessed at 73.48% of their true value.
For the reasons to be set forth below, I conclude that the effective tax rate for 1988 is 2.48%, which is the actual tax rate (3.05%) multiplied by 81.45%, the Director’s school aid ratio for 1988.
While the difference in capitalization rates of the experts is insubstantial, I find, on balance, that the capitalization rate of defendant’s expert, exclusive of the tax rate, enjoys more credible record support. Thus, I find the capitalization rate for tax year 1988 to be 12.49%, consisting of the following components:
*140 75% mortgage @10% interest, 25 years—constant 10.9% 8.18%
25% equity @9% 2.25%
Effective tax rate—3.05% x 81.45% 2.48%
Total capitalization rate 12.91%
Accordingly, the court finds the true value of the subject property on October 1, 1987 for tax year 1988 to be $2,641,900 (rounded) ($341,073 12.91%).
The court finds that the net operating income posited by plaintiff's expert for tax year 1989 ($366,028) is supported by the record. Defendant’s expert submitted no appraisal for that year; he merely offered an unsupported opinion that the subject property increased in value by 10%. The court concludes, however, that the only change in the capitalization rate is in the effective tax rate, which is 2.57% for 1989 (3.157% actual rate x chapter 123 average ratio of 81.45%).
Accordingly, I find the true value of the subject property on October 1, 1988 for tax year 1989 to be $2,815,600 ($366,028 4-13%).

Discrimination.

1988.

Tax year 1988 was a revaluation year to which c. 123 is expressly inapplicable. N.J.S.A. 54:51A-6(d). In a revaluation year it is presumed that all property was uniformly assessed at true value. Tri-Terminal Corp. v. Edgewater, 68 N.J. 405, 346 A.2d 396 (1975); Cantrell v. Upper Pittsgrove Tp., 1 N.J.Tax 508 (Tax Ct.1980).
Plaintiff claims that properties were not assessed at true value; indeed, it alleges they were assessed at 73.48% thereof, as demonstrated by a two-year ratio study involving 1,533 sales.
Plaintiff’s valuation expert compared the sale prices of properties sold in the last six months of 1986, all 12 months of 1987 and the first six months of 1988 to the 1988 assessments on those properties and concluded that the weighted ratio, i.e. the relationship between the aggregate amount of assessments and *141 the aggregate sales prices, was 73.48% and that the unweighted ratio, i.e., the total ratio divided by the total number of sales, was 73.42%.
Also in evidence is a six-month study prepared by the Director, Division of Taxation covering 769 sales (compared to 595 sales utilized by plaintiffs expert) transacted from January 1, 1988 to June 30, 1988. This study reveals a weighted ratio of 62.72% and an unweighted ratio of 67.62%. Both the general coefficient of deviation (26.28%) and the evidence of clusters point to the absence of a common level in 1988. The clusters reconstructed by the court from the 769 sales indicate that 142 sales fell in the 50%-59% range, 171 sales fell in the 60%-69% range and 139 sales fell in the 70%-79% range.
The methodology employed by plaintiffs expert is faulty in that it relates sales in one year to assessments in another year, those assessments being different from the assessments in the year of the sale. Thus, 1986 and 1987 sales are compared to the revaluation assessments of 1988. The ratios derived from the expert’s approach are statistically unreliable. His approach fails to consider the likelihood of a change in value from the sale date to the assessing date for 1988. Moreover, the approach ignores the impact upon selling prices of assessments and tax rates in existence at the times of the 1986 and 1987 sales.
Equality of treatment in sharing the duty to pay real estate taxes is a constitutional right. Murnick v. Asbury Park, 95 N.J. 452, 471 A.2d 1196 (1984). If the assessment ratio applied to a parcel substantially exceeds the assessment ratio generally applied in a municipality, the taxpayer is entitled to relief. Piscataway Associates, Inc. v. Piscataway Tp., 73 N.J. 546, 376 A.2d 527 (1977). Such relief takes the form of a reduction to the common level of assessments prevailing in the taxing district; if there is no common level, the taxpayer’s relief is achieved by application of the school aid ratio provided for in N.J.S.A. 54:1-35.1 to the true value. In re Appeal of *142 Kents 2124 Atlantic Ave., Inc., 34 N.J. 21, 33-34, 166 A.2d 763 (1961).
Since 1978, relief from a discriminatory assessment has been afforded by statute, namely, what is commonly referred to as c. 123. This statute provides for a presumptive common level of assessment, i.e., the Director’s average ratio, which is the exclusive remedy in all but the most extreme or severe circumstances. Murnick v. Asbury Park, supra, 95 N.J. at 463, 471 A.2d 1196.
The statute by its own terms, however, is inapplicable in a revaluation year. N.J.S.A. 54:51A-6(d). Notwithstanding such inapplicability, this court has held that the Legislature did not intend to deny a taxpayer relief from a discriminatory assessment in a revaluation year. Sunshine Biscuits, Inc. v. Sayreville, 4 N.J.Tax 486 (Tax Ct.1982); Highview Estates v. Englewood Cliffs Boro., 6 N.J.Tax 194 (Tax Ct.1983). Indeed, no statute could foreclose a taxpayer’s constitutional right to discrimination relief. Murnick v. Asbury Park, supra, 95 N.J. at 463, 471 A.2d 1196.
Plaintiff has overcome the presumption of uniform assessment practices at 100% of true value in the revaluation year of 1988. The 769 sales transacted in the first six months of 1988 provide sufficient proof that the assessments, for that year, including the assessment on plaintiff’s property, were not uniformly made at true value. See Sunshine Biscuits, Inc. v. Sayreville, supra at 507-508. The high coefficient of deviation (26.28%) is cogent evidence of the lack of uniformity. Fort Lee v. Hudson Terrace Apts., 175 N.J.Super. 221, 237, 417 A.2d 1124 (App.Div.1980). The sales also indicate an average weighted ratio of 62.72% and an unweighted ratio of 67.62%. The coefficient of deviation and the clusters, however, both disclose the absence of a common level. Thus, the average ratios, weighted and unweighted, are merely averages; they are not indicative of a common level.
*143 Under the circumstances, then, plaintiff has not shown entitlement to relief by application of the ratios derived solely from the 769 sales transacted in the first six months of 1988. Assessment stability from one year to the next is promoted by use of a weighted, classified ratio.[2] Rudd v. Cranford Tp., 4 N.J.Tax 236, 249 (Tax Ct.1982). This is the ratio utilized by the Director for school aid purposes as well as chapter 123 purposes. Adequate relief from a discriminatory assessment, consistent with the requirement of assessment stability, is provided by application of the Director’s 1988 school aid ratio (the same as the chapter 123 ratio for tax year 1989) to the court’s finding of true value.

1989.

Jersey City’s assessor was not satisfied with the work done by the revaluation firm in connection with the 1988 revaluation. He and his staff worked six, sometimes seven, days a week to correct what the assessor regarded as mistakes in the revaluation firm’s work. Prior to 1988 the coefficient of deviation was an unacceptable 58%; after the revaluation firm’s work but before the assessor’s corrections the coefficient was 34%, still indicative of a lack of assessment uniformity. The assessor’s corrections brought the final coefficient of deviation for 1988 down to 26.28%.
*144 The assessor continued his review and revision of assessments for tax year 1989. For that year he reassessed 12,199 line items, embracing all classes of property. There were 39,961 line items on the 1989 assessment rolls in Jersey City.
Of the total line items of 39,961, 2.41% are in Class 4b, which is industrial property. Of the 12,199 line item changes the assessor made for 1989, 7.05% involved industrial property.
The assessor testified that, in his view, the land assessments proposed by the revaluation firm for industrial properties situated on Route 440 were less than true value. While he accepted the revaluation firm’s proposed assessments of these properties for 1988, he undertook to change the land assessments for all properties along Route 440 where he believed, from information regarding sales of property in the area, that the land assessments were too low. The subject property was in this category. The change in the subject property’s 1989 assessment was confined to the land component.
The 1989 general coefficient of deviation for Jersey City was 25.99%.
Plaintiff argues that the 1989 assessment was a spot assessment in violation of the New Jersey and United States Constitutions and cites West Milford Tp. v. Van Decker, 120 N.J. 354, 576 A.2d 881 (1990), in support of its position.
In Van Decker, the New Jersey Supreme Court struck down an assessment made on the taxpayer’s property solely on the basis of a sale of the property. The Court found that the assessor had singled out for reassessment only that small group of taxpayers who purchased homes in 1984 while leaving undisturbed the assessments of other property in the same class. Id. at 361, 576 A.2d 881. The court went on to say, however:
A municipality may revise assessments in years other than years of municipal-wide revaluation for legitimate reasons. See, e.g., Handbook for New Jersey Assessors, New Jersey State Div. of Taxation (1989) sec. 902.2 (increased property value based on new improvements), sec. 902.3 (addition of formerly-exempt property); and sec. 903.3 quoted at 361, 576 A.2d at 884; Schwam v. Township of Cedar Grove, 228 N.J.Super. 522, 550 A.2d 502 (App.Div.1988), *145 certif. denied, 115 N.J. 76, 556 A.2d 1219 (1989) (reassessment of apartments converted to condominiums); Frieman v. Randolph Township, 216 N.J.Super. 507, 524 A.2d 453 (App.Div.1987), certif. granted, 108 N.J. 665, 532 A.2d 242 (1987), appeal dismissed, 110 N.J. 294, 540 A.2d 1276 (1988) (reassessment of all apartment complexes in township based on adoption of vacancy decontrol ordinance, and reassessment of all industrial and commercial properties based on study showing they were underassessed as a class)____ [Id. 120 N.J. at 362, 576 A.2d 881.]
The assessor’s action in this case falls within the category of assessment revisions made for legitimate reasons. Defendant’s assessor was confronted with a poorly done revaluation for 1988. An indication of the poor quality is the coefficient of deviation after the revaluation firm’s work, but before the assessor’s corrections, of 34%. The assessor made extensive corrections in the 1988 list and brought the coefficient of deviation down to 26.28% for that year. His continuing efforts to restore uniformity to his assessment list for 1989 brought the coefficient of deviation down still further, to 25.99%.
The assessor did not single out any property or even any class of property for special treatment. His changes were made across the entire spectrum of property classes. Moreover, his change in the subject property’s land assessment was based upon his knowledge of the market in the area in which the subject was located.
In brief, the 1989 assessment in issue was, to paraphrase Justice O’Hern, light years removed from a spot assessment. Id. at 368, 576 A.2d 881.
Plaintiff’s spot assessment claim must therefore fail.
It remains to be seen whether plaintiff is entitled to discrimination relief for 1989 pursuant to N.J.S.A. 54.-51A-6, which provides, pertinently:
b. If the average ratio is below the county percentage level and the ratio of the assessed value of the subject property to its true value exceeds the county percentage level, the tax court shall enter judgment revising the taxable value of the property by applying the average ratio to the true value of the property.
The average ratio is the school aid ratio promulgated for each municipality as of October 1 of the pretax year. N.J.S.A. 54:1-35a(a). The county percentage level in all cases is 100%. The average ratio for Jersey City for 1989 was 81.45%.
*146 As the 1989 assessment exceeds 100% of the true value as herein found for that year, the assessment will be revised by applying the average ratio to the true value.
The Clerk of the Tax Court is directed to enter judgment indicating the assessments to .be:
1988 1989
Land $ 7717900 $1,398/700
Improvements 1,379,900 994,600
Total $2,151,800 $2,293,300

The expert’s value estimate on October 1, 1988, for tax year 1989, was the same as his estimate for the prior year except that he increased his land value and economic rent by 7.5% and his comparable sale by 5%. His capitalization rate was the same except for the effective tax rate.

In determining plaintiffs ratio remedy in this case the court has examined the 508 sales transacted in 1987 proffered in plaintiff’s ratio study. A comparison of the sale prices for those sales with the 1988 assessments was meaningful because the effective tax rates for 1987 and 1988 were comparable, notwithstanding the fact that 1988 was a revaluation year and the actual tax rate for that year was significantly lower than the 1987 tax rate. The chapter 123 ratio for Jersey City for 1987 was 23.82%; Jersey City’s tax rate for that year was 16.206%, resulting in an effective tax rate of $3.86. For the reasons indicated in the text, the court has found the effective tax rate for 1988 to be $2.48. The average unweighted ratio of 1988 assessments to 1987 sale prices for the 508 sales transacted in 1987 was 80.04%. For the reasons stated in the text, the court has selected the 1988 school aid ratio of 81.45% as the measure of plaintiffs ratio relief.