**TAX COURT OF NEW JERSEY**



**Kathi F. Fiamingo**
**Judge**

**120 High Street**
**Mount Holly, NJ 08060**
**(609) 288-9500 Ext 38303**

**NOT FOR PUBLICATION WITHOUT THE APPROVAL OF THE TAX COURT**
**COMMITTEE ON OPINIONS**

February 21, 2019

Mark Roselli, Esq.
Roselli Griegel Lozier & Lazzaro, PC
1337 Highway 33
Hamilton Square, NJ 08690

Kathleen McGill Gaskill, Esq.
712 E. Main Street, Suite 2A
Post Office Box 103
Moorestown, NJ 08057

RE:     Burrs Corporate Center, LLC v. Township of Westampton
        <u>Docket Nos. 015832-2011, 012032-2012, 012616-2013 and 012329-2014</u>

Counsel:

This letter constitutes the court's opinion after trial in the above-referenced matter challenging the 2011 through 2014 tax year assessments on plaintiff's property. For the reasons stated more fully below, the assessments are affirmed.

I.      <u>Procedural History and Factual Findings</u>

The court makes the following findings of fact based on the evidence and testimony offered at trial in this matter.

The subject property consists of a lot comprised of 6.42 acres of land, improved with two one-story flex (office/warehouse) buildings. The subject property is known as Lot 6 in Block 906.07 on the official tax map of the Township of Westampton (Township) and is commonly known as 116-122 Burrs Road. Both improvements were constructed in the mid-1980's and have

*

ceiling heights of 16' in the warehouse areas and 10' high ceilings in the office areas. The buildings are well-maintained in average to good condition for their age.

One of the buildings (116-118 Burrs Road) contains approximately 21,750 square feet. The other building (122 Burrs Road) contains approximately 56,000 square feet. A parking lot accommodates 196 vehicles and has upgraded surfaces. The subject property is located in the OR-1 (Office Research 1) zone of the Township, permitting offices, laboratories, computer and data processing facilities, conference center, medical and dental clinics, child care center, agricultural uses and public uses and buildings. The warehouse use of the subject property is a pre-existing, non-conforming use. The subject property does not conform to the minimum lot size of 10,000 square feet requirement of the OR-1 zone and due to its irregular shape does not conform to the minimum depth of 500 feet at certain points.

The subject property's location on Burrs Road is within 1,000 feet of its intersection with County Road 541 and is less than one mile from access to the New Jersey Turnpike and within two miles of Interstate 295. The buildings are multi-tenanted and contain a mixture of office space (52%) and warehouse (48%), accounting for its flex designation. During the years in question both buildings were divided into an aggregate of ten rental units.

The subject property rents as of 2010, ranged from $11.75 per square foot to $5.00 per square foot, with 10,500 square feet of the total 77,789 leased space remaining vacant. Each of the leases were triple net leases and the aggregate rentals for all of the rented space was $496,446.

The subject property rents as of 2011, ranged from $12.00 per square foot to $5.00 per square foot, with 10,500 square feet of the total 77,789 leased space remaining vacant. Each of the leases were triple net leases and the aggregate rentals for all of the rented space was $495,115.

2

The subject property rents as of 2012, ranged from $12.00 per square foot to $4.43 per square foot. In 2012 all of the space was under rented. Each of the leases were triple net leases and the aggregate rentals for all of the rented space was $548,216.

The subject property rents as of 2013, ranged from $12.25 per square foot to $4.50 per square foot. In 2013 all of the space was under rented. Each of the leases were triple net leases and the aggregate rentals for all of the rented space was $565,156.

For the years in question, 2011-2014, the subject property was assessed as follows:

| | |
|---|---|
| Land: | $ 1,736,100 |
| Improvements: | $ 3,140,800 |
| Total: | $ 4,876,900 |

The average ratio of assessed to true value, commonly referred to as the Chapter 123 ratio, for the Township of Westampton for the 2011 tax year was 100%, making the implied equalized value of the subject property $4,876,900 for that year.[1] For 2012 the Chapter 123 ratio was 101.99%, making the implied equalized value $4,781,743. For the 2013 tax year the Chapter 123 ratio was 100.03%, making the implied equalized value $4,876,900. For 2014 the Chapter 123 ratio was 101.14%, making the implied equalized value $4,821,930.

Plaintiff filed timely appeals with the Tax Court challenging the assessment on the subject property for each of the tax years 2011-2014. The Township filed timely counterclaims for tax years 2011, 2012 and 2014.

At trial plaintiff and defendant each presented the testimony of a N.J. certified real estate appraiser. Both appraisers were accepted without objection and their reports were submitted into evidence. The experts' conclusions as to value were as follows:

| Valuation Date | Plaintiff's Conclusion | Defendant's Conclusion |
|---|---|---|
| October 1, 2010 | $3,560,000 | $5,460,000 |
| October 1, 2011 | $3,560,000 | $5,834,000 |

[1] The Township underwent a revaluation in 2010, effective for the 2011 tax year.

3

| October 1, 2012 | $3,800,000 | $6,084,000 |
| October 1, 2013 | $3,750,000 | $5,999,000 |

Plaintiff also presented the testimony of one of officers as a rebuttal witness.[2]

II.    Conclusions of Law

   A.    Presumption of Validity

The court's analysis begins with the well-established principle that "[o]riginal assessments and judgments of county boards of taxation are entitled to a presumption of validity." MSGW Real Estate Fund, LLC v. Borough of Mountain Lakes, 18 N.J. Tax 364, 373 (Tax 1998). As Judge Kuskin explained, our Supreme Court has defined the parameters of the presumption as follows:

> The presumption attaches to the quantum of the tax assessment. Based on this presumption the appealing taxpayer has the burden of proving that the assessment is erroneous. The presumption in favor of the taxing authority can be rebutted only by cogent evidence, a proposition that has long been settled. The strength of the presumption is exemplified by the nature of the evidence that is required to overcome it. That evidence must be "definite, positive and certain in quality and quantity to overcome the presumption."
>
> [Ibid. (quoting Pantasote Co. v. City of Passaic, 100 N.J. 408, 413 (1985)(citations omitted)).]

The presumption of correctness arises from the view "that in tax matters it is to be presumed that governmental authority has been exercised correctly and in accordance with law." Pantasote, supra, 100 N.J. at 413 (citing Powder Mill, I Assocs. v. Township of Hamilton, 3 N.J. Tax 439 (Tax 1981)); see also Byram Twp. v. Western World, Inc., 111 N.J. 222 (1988). The presumption remains "in place even if the municipality utilized a flawed valuation methodology, so long as the quantum of the assessment is not so far removed from the true value of the property or the method of assessment itself is so patently defective as to justify removal of the presumption of validity."

---

[2] Plaintiff's expert also testified as a rebuttal witness.

Transcontinental Gas Pipe Line Corp. v. Township of Bernards, 111 N.J. 507, 517 (1988)(citation omitted).

"In the absence of a R. 4:37-2(b) motion . . . the presumption of validity remains in the case through the close of all proofs." MSGW Real Estate Fund, LLC, supra, 18 N.J. Tax at 377. In making the determination of whether the presumption has been overcome, the court should weigh and analyze the evidence "as if a motion for judgment at the close of all the evidence had been made pursuant to R. 4:40-1 (whether or not the defendant or plaintiff actually so moves), employing the evidentiary standard applicable to such a motion." Ibid. The court must accept as true the proofs of the party challenging the assessment and accord that party all legitimate favorable inferences from that evidence. Id. at 376 (citing Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 535 (1995)). In order to overcome the presumption, the evidence "must be 'sufficient to determine the value of the property under appeal, thereby establishing the existence of a debatable question as to the correctness of the assessment.'" West Colonial Enters, LLC v. City of East Orange, 20 N.J. Tax 576, 579 (Tax 2003) (quoting Lenal Props., Inc. v. City of Jersey City, 18 N.J. Tax 405, 408 (Tax 1999), aff'd, 18 N.J. Tax 658 (App. Div.), certif. denied, 165 N.J. 488 (2000)).

The defendant made a motion to dismiss for failure to overcome the presumption of correctness at the end of the plaintiff's case. The court reserved on the motion. Although the court finds the plaintiff's expert's testimony and report problematic, the court finds that if accepted as true, the opinion of plaintiff's expert creates a debatable question regarding the correctness of the assessments in each tax year sufficient to allow the court to make an independent determination of the value of the subject property. Plaintiff's expert opined that on the relevant valuation dates the subject property was worth in excess of $1,000,000 less than the implied equalized value. Thus, if taken as true, the opinion of plaintiff's expert supports a conclusion that the subject property

was assessed well in excess of its true market value for all four tax years. The court therefore denies defendant's motion to dismiss for failure to overcome the presumption of correctness.

The court's inquiry, however, does not end here. Concluding the presumption of validity has been overcome does not equate to a finding by the court that the assessments are erroneous. Once the presumption has been overcome, "the court must then turn to a consideration of the evidence adduced on behalf of both parties and conclude the matter based on a fair preponderance of the evidence." Ford Motor Co. v. Township of Edison, 127 N.J. 290, 312 (1992). The court must be mindful that "although there may have been enough evidence [presented] to overcome the presumption of correctness at the close of plaintiff's case-in-chief, the burden of proof remain[s] on the taxpayer throughout the entire case…to demonstrate that the judgment under review was incorrect." Id. at 314-15 (citing Pantasote Co., 100 N.J. at 413). Only after the presumption is overcome with sufficient evidence at the close of trial must the court "appraise the testimony, make a determination of true value and fix the assessment." Rodwood Gardens, Inc. v. City of Summit, 188 N.J. Super. 34, 38-39 (App. Div. 1982)(citations omitted).

Accordingly, the court will evaluate and weigh the evidence presented to determine if either party has met the requisite burden of proof.

B.     Highest and Best Use

In determining the market value of a property, the court must first find the highest and best use of that property. As explained Judge Andresini:

> For property tax assessment purposes, property must be valued at its highest and best use. Ford Motor Co. v. Township of Edison, 127 N.J. 290, 300-01, 604 A.2d 580 (1992). "Any parcel of land should be examined for all possible uses and that use which will yield the highest return should be selected." Inmar Associates, Inc. v. Township of Edison, 2 N.J. Tax 59, 64 (Tax 1980). Accordingly, the first step in the valuation process is the determination of the highest and best use for the subject property. American Cyanamid Co. v. Township of Wayne, 17 N.J. Tax 542, 550 (Tax 1998), aff'd 19 N.J. Tax 46 (App. Div. 2000). "The concept of highest and best

6

use is not only fundamental to valuation but is a crucial determination of market value. This is why it is the first and most important step in the valuation process." Ford Motor Co. v. Township of Edison, 10 N.J. Tax 153, 161 (Tax 1988) aff'd o.b. per curiam, 12 N.J. 290, 604 A.2d 580 (1992); see also Gen. Motors Corp. v. City of Linden, 22 N.J. Tax 95, 107 (Tax 2005).

The definition of highest and best use contained in The Appraisal of Real Estate, a text frequently used by this court as a source of basic appraisal principles, has remained relatively constant for all of the years under appeal. Highest and best use is defined as:

> The reasonably probable and legal use of vacant land or improved property that is physically possible, appropriately supported, and financially feasible and that results in the highest value.
>
> [Appraisal Institute, The Appraisal of Real Estate, 22 (13th ed. 2008)]

The highest and best use analysis requires sequential consideration of the following four criteria, determining whether the use of the subject property is: 1) legally permissible; 2) physically possible; 3) financially feasible; and 4) maximally productive. Ford Motor Co., supra, 10 N.J. Tax at 161; See also, The Appraisal of Real Estate at 279. Implicit in this analysis is the assumption that the proposed use is market-driven; in other words, that it is determined in a value-in-exchange context and that there is a market for such use. WCI-Westinghouse v. township of Edison, 7 N.J. Tax 610, 616-617 (Tax 1985), aff'd o.b. per curiam, 9 N.J. Tax 86 (App. Div. 1986). A highest and best use determination is not based on value-in-use because the determination is a function of property use and not a function of a particular owner's use or subjective judgment as to how a property should be used. See Entenmann's Inc. v. Borough of Totowa, 18 N.J. Tax 540, 545 (Tax 2000). The highest and best use of an improved property is the "use that maximizes an investment property's value, consistent with the rate of return and associated risk." Ford Motor Co., supra, 127 N.J. at 301, 604 A.2d 580. Further, the "actual use is a strong consideration in the analysis. Ford Motor Co., supra 10 N.J. Tax at 167.

Highest and best use is not determined through subjective analysis by the property owner. The Appraisal of Real Estate at 279. The proper highest and best use requires a comprehensive market analysis to ascertain the supply and demand characteristics of alternative uses. See, Cherry Hill, Inc. v. Township of Chery Hill, 7 N.J. Tax 120, 131 (Tax 1984), aff'd, 8 N.J. Tax 334 (App. Div. 1986). Additionally, the proposed use must not be remote,

7

speculative or conjectural. Id. If a party seeks to demonstrate that a property's highest and best use is other than its current use, it is incumbent upon that party to establish that proposition by a fair preponderance of the evidence. Penn's Grove Gardens, Ltd. v. Borough of Penns Grove, 18 N.J. Tax 253, 263 (Tax 1999); Ford Motor Corp., supra 10 N.J. Tax at 167. Property should be assessed in the condition in which it is utilized and the burden is on the person claiming otherwise to establish differently. Highview Estates v. Borough of Englewood Cliffs, 6 N.J. Tax 194, 200 (Tax 1983).

Clemente v. Township of South Hackensack, 27 N.J. Tax 255, 267-269 (Tax 2013), aff'd o.b. 28 N.J. Tax 337 (App. Div. 2015):

The highest and best use opinion offered by both the experts was the current use of the subject property. That use was described by plaintiff's expert as "industrial." Yet during his testimony, plaintiff's expert confirmed that the use was flex space, predominated by office. Defendant's expert described that use as "Flex (Office/warehouse) facility." The court finds that the highest and best use of the subject premises was it current use, which is most appropriately described as flex (office/warehouse) facility.

C.    Valuation Methodology

"There is no single determinative approach to the valuation of real property." 125 Monitor Street LLC v. City of Jersey City, 21 N.J. Tax 232, 237-238 (Tax 2004) (citing Samuel Hird & Sons, Inc. v. City of Garfield, 87 N.J. Super. 65, 72, 208 A.2d 153 (App. Div. 1965)); see also ITT Continental Baking Co. v. Township of East Brunswick, 1 N.J. Tax 244, 251 (Tax 1980). "There are three traditional appraisal methods utilized to predict what a willing buyer would pay a willing seller on a given date, applicable to different types of properties: the comparable sales method, capitalization of income and cost." Brown v. Borough of Glen Rock, 19 N.J. Tax 366, 376 (App. Div. 2001), certif. denied, 168 N.J. 291, 773 A.2d 1155 (2001) (internal citation omitted)). The "decision as to which valuation approach should predominate depends upon the facts of the particular case and the reaction to these facts by the experts." Coca-Cola Bottling Co. of New York v. Neptune Township, 8 N.J. Tax 169, 176 (Tax 1986) (citing City of New Brunswick v. State Div. Tax Appeals, 39 N.J. 537, 189 A.2d 702 (1963)); see also WCI-Westinghouse, Inc. v. Township of Edison, 7 N.J. Tax, 610, 619 (Tax 1985), aff'd, 9 N.J. Tax 86 (App. Div. 1986). However, when the proofs submitted in support of one approach overshadow those

submitted in support of any other approach, the court may conclude which approach should prevail. See ITT Continental Baking Co., supra, 1 N.J. Tax 244; Pennwalt Corp. v. Township of Holmdel, 4 N.J. Tax 51 (Tax 1982).

[VBV Realty, LLC v. Scotch Plains Tp., 29 N.J. Tax 548, 558-59 (Tax 2017)]

The sales comparison approach derives an opinion of market value "by comparing properties similar to the subject property that have recently sold, are listed for sale, or are under contract." Appraisal Institute, The Appraisal of Real Estate 377 (14th ed. 2013). The sales comparison approach involves a "comparative analysis of properties" and requires the expert to focus on the "similarities and differences that affect value…which may include variations in property rights, financing, terms, market conditions and physical characteristics." Id. at 378. "When data is available, this [approach] is the most straight forward and simple way to explain and support an opinion of market value." Greenblatt v. Englewood City, 26 N.J. Tax 41 (Tax 2011)(citing Appraisal Institute, The Appraisal of Real Estate 300 (13th ed. 2008)).

The cost approach derives a property's value "by adding the estimated value of the land to the current costs of constructing a reproduction or replacement for the improvements and then subtracting the amount of depreciation (i.e., deterioration and obsolescence) in the structures from all causes." Appraisal Institute, The Appraisal of Real Estate, 47 (14th ed. 2013). Thus, the cost approach consists of "two elements - land value and the reproduction or replacement cost of the buildings and other improvements." International Flavors & Fragrances, Inc. v. Union Beach Borough, 21 N.J. Tax 403, 417 (Tax 2004).

The income capitalization approach is the preferred method of estimating the value of income producing property. Parkway Village Apartments Co. v. Township of Cranford, 108 N.J. 266, 270 (1987); Hull Junction Holding Corp. v. Borough of Princeton, 16 N.J. Tax 68, 79 (1996). "The income capitalization approach to value consists of . . . procedures that an appraiser uses to

9

analyze a property's capacity to generate benefits (i.e., usually the monetary benefits of income and reversion) and convert these benefits into an indication of present value." Appraisal Institute, The Appraisal of Real Estate 439 (14th ed 2013).

> ### D. Plaintiff's valuation

Plaintiff's expert considered all three approaches to value, but did not apply the cost approach due to several factors, including the subject's age and the difficulty in determining appropriate depreciation. Plaintiff's expert instead considered both the sale approach and the income approach, placing more weight on the income approach.

> #### 1. Plaintiff's Sales Approach

For the 2011 tax year plaintiff's expert considered four sales, all of which closed in 2009. Gross adjustments ranged from 30% to 40% and included adjustments for a) conditions of sale; b) date of sale; c) location; d) land size and shape; e) building size; and f) height. It was unclear if any of the subject sales were comparable flex facilities: Comparable sale 1 was a single tenanted building with 3% office space; comparable sale 2 was vacant with undisclosed office space; comparable sale 3 had 24% office space, but no indication of the number of units or tenants; and comparable sale 4 had 15% office space leased to multiple tenants. It was not clear if comparable sale 4 was merely multi-tenanted or constituted flex space. The expert provided no data to support any of the adjustments made. Similarly, no data was provided for any of the adjustments made in the sales approach analysis performed for tax years 2012, 2013 and 2014.

Under the sales comparison approach, market value is obtained "by comparing properties similar to the subject property that have recently sold, are listed for sale, or are under contract." Appraisal Institute, The Appraisal of Real Estate, 377 (14th ed. 2013). Using various analysis techniques such as "paired data analysis, trend analysis, statistics, and other techniques" the

appraiser focuses on similarities and differences that affect value . . . which may include variations in property rights, financing terms, market conditions and physical characteristics." Id. at 378.

The weight to be afforded an expert's testimony relative to adjustments "depends upon the facts and reasoning which form the basis of the opinion. An expert's conclusion can rise no higher than the data providing the foundation (citation omitted). If the bases for the adjustments are not made evident the court cannot extrapolate value." Inmar Associates v. Edison Township, 2 N.J. Tax 59, 66 (Tax 1980). "Without explanation as to the basis, the opinion of the expert is entitled to little weight in this regard." Dworman v. Tinton Falls, 1 N.J. Tax 445, 458 (Tax 1980) (citing to Passaic v. Gera Mills, 55 N.J. Super. 73 (App. Div. 1959), certif. denied, 30 N.J. 153 (1959)). For an expert's testimony to be of any value to the trier of fact, it must have a proper foundation. See Peer v. City of Newark, 71 N.J. Super. 12, 21 (App. Div. 1961), certif. denied, 36 N.J. 300 (1962). When "an expert offers an opinion without providing specific underlying reasons . . . he ceases to be an aid to the trier of fact." Jimenez v. GNOC, Corp., 286 N.J. Super. 533, 540 (App. Div. 1996). An expert witness is required to "give the why and wherefore of his expert opinion, not just a mere conclusion." Ibid.

Here plaintiff's expert failed to provide any support for the adjustments made to each of the comparable sales in any of the years under review. For those reasons alone the adjustments made to arrive at a value are not reliable or credible. Additionally, it is not at all clear that the comparable properties were comparable flex properties and in many instances were clearly not similar properties. Moreover, the property in question was more appropriately valued as income producing property. For all of the foregoing reasons, the court rejects the plaintiff's expert's conclusion of value under the sales comparison method.

2. Plaintiff's Income Approach

Plaintiff's expert then analyzed the subject's value utilizing the income approach. The court finds that the income capitalization approach is the most appropriate approach to value the subject property. See, Hull Junction, 16 N.J. Tax 79 ("the income approach is . . . the proper method for determining the value of [property which produces income].")

Determining the value of real property pursuant to the income approach is achieved by the following process:

|  | Market Rent |
| --- | --- |
| Times | x Square footage |
| Equals | = Potential Gross Income |
|  |  |
| Less | - Vacancy Rate and Collection Losses |
| Equals | = Effective Gross Income |
|  |  |
| Less | - Operating Expenses |
| Equals | = Net Operating Income |
|  |  |
| Divided by | ÷ Capitalization Rate |
| Equals | = Property Value |

See, Spiegel v. Town of Harrison, 19 N.J. Tax 291, 295 (App. Div. 2001), aff'g, 18 N.J. Tax 416 (Tax 1999).

"Central to an income analysis is the determination of the economic rent, also known as the 'market rent' or 'fair rental value.'" Parkway Village Apartments, supra, 108 N.J. at 270. This differs from the actual rental income from the subject property, which may be below market rates. Parkview Village Assocs. v. Borough of Collingswood, 62 N.J. 21, 29-30 (1972). Despite that, "actual income is a significant probative factor in the inquiry as to economic income." Id. at 30.

Plaintiff's expert relied on the subject leases in determining the market rents, with references to "asking rents" for various "competitive" properties in 2010 for confirmation. The average of the actual rents at the subject property was $7.38 per square foot for 2010. The expert

opined that the subject leases commenced prior to the current recession and that the rents were not determined with the parties' anticipation of the economic turndown.

The expert concluded a market rent of $6.00 per square foot on a triple net basis, "since it is supportable based on the more recent subject's lease modified to reflect the competitive marketplace even though the subject's own asking lease on the vacant space is $3.95 per square foot." Seemingly contradictory to the foregoing statement, the expert then stated, "[s]ince actual contract rates are typically negotiated to a *rate lower than the listed rate*, . . ., the $6.00 per square foot is a reasonable reflection of market rents for the subject's mix of space." The expert did not identify the category or amount of any adjustment made, nor did he provide a further explanation as to how he arrived at the concluded market rent of $6.00 per square foot.

Furthermore, plaintiff's expert's report did not set forth the actual lease commencement dates of the subject leases or, where appropriate, the renewal dates and rates. Cross examination revealed that negotiations for one lease were conducted during the applicable valuation period resulting in a rental rate of $11.75 per square foot. In that case, the expert speculated that tenants renewed at a significantly higher rates than the concluded rental due to the costs of moving a business. The expert did not provide a factual basis for this speculation.

No testimony was provided as to the effect, if any, of the mix of space rented in any lease, on the rental rate. That is, although it is apparent that the rental rate for office space was a rate higher than that of warehouse/industrial space, the expert did not provide the court with the specific percentage of office to warehouse for any particular leased area or how the variation on that mix might affect the overall rental rate per square foot.

Plaintiff's expert provided nothing to support his conclusion that the actual rents constituted market rents. The only data provided by the expert to support the actual rents as market

13

rent were all asking rents.[3]  Asking rates are generally unreliable indicators of a subject's value. They "represent only one-half of the necessary equation" namely, a willing landlord, but no willing tenant. Korvettes Home Furnishing Ctr. v. Borough of Elmwood Park, 1 N.J. Tax 287, 291 (Tax 1980).  Furthermore lease terms "could well change" when the lease is finally consummated. Lamm Assocs. v. Borough of Caldwell, 1 N.J. Tax 373, 379 (Tax 1980). Thus, the offers are not "evidentiary and may not be considered in determining a property's economic rent." Harrison Realty Corp. v. Township of Harrison, 16 N.J. Tax 375, 381-83 n.3 (Tax 1997) (citations omitted), aff'd, 17 N.J. Tax 174 (App. Div. 1997), certif. denied, 153 N.J. 213 (1998).

Judicial inquiry into valuation under the income approach cannot proceed without satisfactory proofs of economic rent. Rodwood Gardens, Inc. v. Summit, 188 N.J. Super. 34.(App. Div. 1982).  "No doubt the fair rental value, rather than the actual rent payable under an existing lease, must control."  New Brunswick v. State Div. of Tax Appeals, 39 N.J. 537, 544 (1963); See McCrory Stores Corp. v. Asbury Park, 89 N.J. Super 234 (App. Div. 1965).  "Checking actual income to determine whether it reflects economic income is a process of sound appraisal judgment applied to rentals currently being charged for comparable facilities in the competitive area. The essential, however, is a plurality of comparables."  (citations omitted)  Parkview Vill. Assocs. v. Collingswood, 62 N.J. at 30.  There the court found that,

> In the absence of convincing evidence to the contrary the current ongoing income scale of a large, well-managed apartment project like this, functioning as customary with leases of relatively short length, should be deemed prima facie to represent its fair rental value for purposes of the capitalized income method of property valuation.
>
> [Id. at 34.]

---

[3] On cross-examination plaintiff's expert clarified that he did not rely on the asking rents and relied instead on the subject rents.  At the same time, he acknowledged that he made adjustments to the subject rents based on his discussions with "local participants" and the asking rents reported.  Clearly, then, the asking rents were a factor in determining economic rent.  Moreover, each of the properties identified in 2010 in the asking rent comparison were identified as "indust/flex".  The subject property, having a majority of office space would not appear to fit within that designation.

The rule was reaffirmed in <u>Parkway Village Apartments Co. v. Cranford</u>, 108 N.J. 266 and extended to hotels in <u>Glen Pointe Assocs. V. Twp. of Teaneck</u>, 10 N.J. Tax 380 (Tax 1989). It has not been extended to other commercial ventures. Nothing presented by plaintiff would suggest to this court that the concept should be extended here. Moreover, plaintiff's expert opined that the commencement date of the subject leases were all prior to the valuation date and the commencement of the economic turndown, a factor which was taken into account when arriving at economic rent. Clearly, then the subject rents do not constitute economic rent.

As a result of all of the foregoing, the court finds that plaintiff's expert's conclusion of economic rent for the 2011 tax year is not supported by any credible data. For that reason his conclusion of value based on the income approach is flawed and must be rejected.

For tax year 2012, plaintiff's expert provided "actual leases" with starting dates in 2007, 2010 and 2011 with rents ranging from $0.00 per square foot to $8.00 per square foot. He also referenced asking rents ranging from $3.85 to $7.00. While he concluded a gross rent of $6.00 per square foot, he did not explain how the leases he referenced impacted that decision. No adjustment grid was provided, no information regarding the leases themselves, the properties leased, or the percentage of office to warehouse leased, was provided. Some of the leased space was characterized as ind/flex and not as office/flex, the use of the subject space. Although the expert conceded that the difference in designation between office/flex and indust/flex would require adjustment, the expert did not indicate what that adjustment was or how it was applied to reach his final conclusion. Nothing provided indicated what the mix was for any particular lease. It appears that the expert did not actually review any of the comparable leases. Thus the basis for comparison for any of the leases is suspect, at best and other than the expert's general conclusion that the leases reflected decreased rents as a result of recession, nothing was provided to indicate how the comparable leases impacted the expert's determination.

The determination of market rents for the 2013 and 2014 tax years suffer from the identical flaws. The expert provided little data to support the adjustments he made to arrive at his conclusion of market rent. Moreover, the actual adjustments made were not identified. Plaintiff's expert's opinion provides the court with no basis upon which to determine value. See Inmar Associates v. Edison Township, 2 N.J. Tax 59; Dworman v. Tinton Falls, 1 N.J. Tax 445. Mere conclusions are an insufficient basis upon which an expert's opinion can be based. Jimenez v. GNOC, Corp., 286 N.J. Super. 533. Thus, the conclusions reached by plaintiff's expert are rejected.

E.    Defendant's Valuation

Defendant's expert employed the income capitalization approach to value the subject property. In establishing economic rents for the 2011 tax year, the expert examined five leases including two in the subject property. The rents ranged from $4.25 per square foot to $9.25 per square foot. Only one of the leases had a rent commencement date within 12 months of the valuation date, with the others commencing in mid-2009, 2008 and 2007. The expert made no adjustment for market condition, opining that the office/industrial market was relatively stable within nominal increases and decreases during this time period.

The expert made an adjustment to one lease for conditions of rental, noting that the landlord provided a tenant fit up, which she amortized over the term of the lease. She made a 10% location adjustment to each of the comparable leases other than the subject leases due to their "inferior" location. By way of explanation, the expert noted that the comparable properties were roughly 5 to 8 miles from Routes 295 and the New Jersey Turnpike, as compared to the subject's location within one mile of those roadways as support for that adjustment. The expert did not, however, provide the court with data supporting her determination that an adjustment was warranted for the additional distance, or to support the amount of the adjustment.

The expert also made a downward 5% adjustment for the age and condition of the comparable properties, noting that they were built in 1988 and 1991, as compared to the subject's improvements built in 1983 and 1985. Other than noting the age of the improvements, no other basis was provided for the condition adjustment. She further applied a 5% downward adjustment to the comparables for their superior ceiling height in the warehouse section of those properties. While modest, the expert provided nothing to support the quantity of the adjustments made in both cases.

Finally, the expert adjusted one comparable with a finished office of 60% space by 5% to account for the subject's 52% of finished office space. She adjusted the remaining two comparables with a 30% upward adjustment due to their inferior office mix of 24%.

Of the five leases compared for the 2011 tax year, two were the subject leases; one lease had gross adjustments of 25% and the remaining two leases had gross adjustments of 50%. The court questions the comparability of leases when the gross adjustments are of the magnitude of 50%. See Pansini Custom Design Associates, LLC v. City of Ocean City, 407 N.J. Super. 137, 148 (App. Div. 2009) ("Adjustments to sales of a large magnitude 'vitiate' comparability"); M.I. Holdings v. City of Jersey City, 12 N.J. Tax 129, 137 (Tax 1991) (concluding that gross adjustments of 42% to 63% were incompatible to the subject property and not probative of its true value).

Moreover, other than noting the superior or inferior aspects of the comparables to the subject to support the need for adjustment, the expert provided no basis for the amounts of those adjustments. For example, although opining that the increased ceiling height in the comparable properties were superior and required adjustment, the expert did not explain how she arrived at the 5% downward adjustment made. This is particularly problematic when one considers that two of the comparable properties for which this adjustment was made, were further adjusted by 30% (also

17

unsupported) to account for their paucity of office space (24% compared to 47-49% at the subject property).

> It is well settled in the realm of tax appeals that an expert's reliance on subjective measures for calculation and application of adjustments is unacceptable. Greenblatt v. Township of Englewood, 26 N.J. Tax 41, 55 (Tax 2012) ("adjustments must have a foundation obtained from the market" with an "explanation of the methodology and assumptions used in arriving at the [] adjustments []" otherwise they are entitled to little weight). In Dworman v. Borough of Tinton Falls, 1 N.J. Tax 445, 458, this court established that "[t]he opinion of an expert depends upon the facts and reasoning which form the basis of the opinion. Without explanation as to the basis, the opinion of the expert is entitled to little weight in this regard." Thus an expert's opinion is only as good as the data upon which the expert relied. See Congoleum Corp. v. Township of Hamilton, 7 N.J. Tax 436, 451 (Tax 1985) (Adjustments must be adequately supported by objective data); Kearny Leasing Corp. v. Township of Kearny, 6 N.J. Tax 363, 376 (Tax 1984), aff'd o.b., 7 N.J. Tax 665 (App. Div. 1985), certif. denied, 102 N.J. 340, 508 A.2d 215 (1985). "An expert's conclusion rises no higher than the data which provide the foundation." City of West Orange v. Goldman, 2 N.J. Tax 582, 588 (Tax 1981) (citations omitted). "Expert opinion unsupported by adequate facts has consistently been rejected by the Tax Court." Hull Junction Holding Corp. v. Princeton Borough, supra, 16 N.J. Tax at 98 (citing Willow/Leonia Assocs. v. Borough of Leonia, 12 N.J. Tax 338, 344 (1992)).
>
> [TD Bank v. City of Hackensack, 28 N.J. Tax 363, 382–83 (2015).]

Here, the expert provided the court with no explanation as to the methodology employed in arriving at the various adjustments. Thus, the court cannot determine the reliability or credibility of those adjustments.

The court would thus be left with the subject leases which the expert included in her analysis as the basis for the net operating income. Utilization of the subject lease rentals as the sole basis for determining economic rent is unacceptable. Based on the evidence provided by the defendant, the court is unable to conclude that the subject rents constitute market rent. Without satisfactory proofs of economic rent, the court cannot conclude value. Rodwood Gardens, Inc. v.

Summit, 188 N.J. Super. 34. The court has no alternative but to reject defendant's expert's conclusion of value.

The expert's analysis of value for the following years suffer from the same flaws noted above. None of the adjustments made are supported with objective data. A majority of the comparable leases are adjusted by 45% to 50%. The only leases considered by defendant's expert which are not adjusted are at the subject. Thus, the court is constrained to reject the defendant's expert's conclusions of market rent, and therefore market value, for the subsequent years.

F. Conclusions

The court is mindful of its obligation "to apply its own judgment to valuation data submitted by experts in order to arrive at a true value and find an assessment for the years in question." Glen Wall Associates v. Wall. Twp., 99 N.J. 265, 280 (1985) (citing New Cumberland Corp. v. Roselle Borough, 3 N.J. Tax, 345, 353 (Tax 1981)). To enable the court to make an independent finding of true value, credible and competent evidence must be adduced in the trial record.

The court's independent determination of value must be based "on the evidence before it and the data that are properly at its disposal." F.M.C. Stores Co. v. Morris Plains Borough, 100 N.J. 418, 430 (1985). Here, the court concludes that the trial record contains insufficient information to enable the court to make a credible and reliable independent finding regarding the subject property's market rents for the years in question. Accordingly, as a result of the above stated inadequacies, insufficient credible evidence exists for this court to make an independent determination of the true market value of the subject property by a fair preponderance of the evidence.

19

For all of the foregoing reasons, the court finds that neither plaintiff nor defendant has overcome the presumption of correctness of the assessments. As a result, the assessments for each of the years under review are affirmed.

Very truly yours,


Kathi.F. Fiamingo, J.T.C.